**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| **METRON NUTRACEUTICALS, LLC**<br>4600 Euclid Ave #401<br>Cleveland, Ohio 44103<br><br>            Plaintiff,<br>v. | CASE NO.: 1:20-cv-01803<br><br>Judge Patricia A. Gaughan |
| **CHRISTINA RAHM COOK** aka Christina<br>Rahm<br>232 Governors Way<br>Brentwood, Tennessee 37027<br><br>116 Wilson Pike Circle, Suite 240<br>Brentwood, TN 37027 | **AMENDED COMPLAINT** |
| **DR. CHRISTINA RAHM, LLC**<br>330 Franklin Rd., Suite 135A-244<br>Brentwood, Tennessee 37027<br><br>c/o Registered Agent:<br>Registered Agents Inc.<br>5810 Shelby Oaks Dr., Suite B<br>Memphis, Tennessee 38134 | *(Jury Demand Endorsed Herein)* |
| **DR CHRISTINA RAHM VENTURES<br>INCORPORATED**<br>4515 Harding Pike Suite 107<br>Nashville, Tennessee 37205<br><br>c/o Registered Agent:<br>Registered Agents Inc.<br>5810 Shelby Oaks Dr., Suite B<br>Memphis, Tennessee 38134 | |
| **CURE THE CAUSES, INC.**<br>232 Governors Way<br>Brentwood, Tennessee 37027<br><br>c/o Registered Agent:<br>Registered Agents Inc.<br>5810 Shelby Oaks Dr., Suite B<br>Memphis, Tennessee 38134 | |

**MERCI DUPRE LLC**
330 Franklin Road, Suite 135A-244
Brentwood, Tennessee 37027

c/o Registered Agent:
Registered Agents Inc.
5810 Shelby Oaks Dr., Suite B
Memphis, Tennessee 38134

**DC2 HOLDINGS, LLC** d/b/a "DC2
Healthcare"
116 Wilson Pike Cir., Ste 240,
Brentwood, TN 37027

**DC2 HEALTHCARE LLC** d/b/a "DC2
Healthcare"
c/o Registered Agent
United States Corporation Agents, Inc.
221 N. Broad St., Suite 3A
Middletown, Delaware  19709

**CLAYTON THOMAS**
1704 Championship Blvd
Franklin, TN 37064

116 Wilson Pike Cir. Ste 100
Brentwood, TN 37027

232 Governors Way
Brentwood, Tennessee 37027

**SIMPLY WHOLEISTIC, INC.** d/b/a
ROOT, INC.
c/o Registered Agent
Kline Preston, Ste 107
4515 Harding Pike Ste 107
Nashville, Tennessee 37205

**ROOT WELLNESS, LLC**
116 Wilson Pike Cir. Ste 100
Brentwood, TN 37027

1213 N. Kingshighway St., Suite 102
Cape Girardeau, Missouri, 63703

c/o Registered Agent:
United States Corporation Agents, Inc.
5 Doctors Park
Cape Girardeau, Missouri 63703

**MARK E. ADAMS**
6001 Cervinus Run
Austin, Texas 78735

**ENTOX SOLUTIONS LLC**
6101 W. Courtyard Dr.
Building 5, Suite 100
Austin, Texas 78730

11380 Prosperity Farms Road, #221E
Palm Beach Gardens, Florida 33410

c/o Registered Agent:
Corporate Creations Network Inc.
2425 W. Loop South #200
Houston, Texas 77027

**TOP PARTNERS MANAGEMENT, LLC**
11380 Prosperity Farms Road, #221E
Palm Beach Gardens, Florida 33410

c/o Registered Agent:
Corporate Creations Network Inc.
2425 W. Loop South #200
Houston, Texas 77027

                    Defendants.

---

Metron Nutraceuticals, LLC ("Metron") brings this Amended Complaint against Defendants Christina Rahm Cook; Dr. Christina Rahm, LLC; Dr Christina Rahm Ventures Incorporated; Cure the Causes, Inc.; Merci Dupre LLC; DC2 Holdings, LLC; DC2 Healthcare, LLC; Clayton Thomas; Simply Wholeistic, Inc.; Root Wellness, LLC; Mark E. Adams, EnTox Solutions LLC; and TOP Partners Managements, LLC (collectively, "Defendants") and states the following:

## PARTIES AND JURISDICTION

1.      Metron is now, and was at all times, an Ohio company with its principal place of business at 4600 Euclid Ave #401, Cleveland, Ohio.

2.      Christina Rahm Cook ("Cook") resides at 232 Governors Way, Brentwood, Tennessee 37027.

3.      Cook conducts business at 116 Wilson Pike Circle, Suite 240, Brentwood, TN 37027.

4.      Simply Wholeistic, Inc. filed its Articles of Incorporation with the Tennessee Secretary of State.  Kline Preston is the registered agent located at 4515 Harding Pike, Suite 107, Nashville, Tennessee 37205.  Simply Wholeistic, Inc.'s principal office is located at 4515 Harding Pike, Suite 107, Nashville, Tennessee 37205.

5.      Dr Christina Rahm Ventures Incorporated is a for-profit corporation formed in Tennessee and registered with the Tennessee Secretary of State.   Dr Christina Rahm Ventures Incorporated's "Principal Office" and "Mailing Address" is the same "Principal Office" and "Mailing Address" of Simply Wholeistic, Inc.:  4515 Harding Pike, Suite 107, Nashville, Tennessee 37205.

6.      Cook is the founder and/or majority owner of Dr Christina Rahm Ventures Incorporated.

7.      Dr Christina Rahm Ventures Incorporated has 10,000 shares of stock.

8.      Cook owns stock in Dr Christina Rahm Ventures Incorporated.

9.      Clayton Thomas owns stock in Dr Christina Rahm Ventures Incorporated.

10.      Upon information and belief, Clayton Thomas is involved with the business affairs of Dr Christina Rahm Ventures Incorporated.

11.     On July 30, 2020, Dr. Christina Rahm, LLC was formed in Tennessee and registered with the Tennessee Secretary of State.   Dr. Christina Rahm, LLC's "Principal Office" and "Mailing Address" is 330 Franklin Road, Suite 135A-244, Brentwood, Tennessee 37027.

12.     Upon information and belief, Cook is the sole member of Dr. Christina Rahm, LLC.

13.     Dr. Christina Rahm, LLC is "Director Managed," and Cook is the "Director."

14.     Cook formed Dr. Christina Rahm, LLC after being served Metron's original Complaint in this matter.

15.     Upon information and belief, Clayton Thomas and/or other Defendants are involved with the business affairs of Dr. Christina Rahm, LLC.

16.     Cure the Causes, Inc. is a Tennessee for-profit corporation registered with the Tennessee Secretary of State.  Cure the Causes, Inc.'s listed "Principal Office" is the same as Cook's residential address:   232 Governors Way, Brentwood, Tennessee 37027.   Cure the Causes, Inc.'s listed "Mailing Address" is the same as the "Mailing Address" for Dr. Christina Rahm, LLC:  330 Franklin Road, Suite 135A-244, Brentwood, Tennessee.

17.     Cure the Causes, Inc. has 20,000 shares of stock.

18.     Cook owns stock in Cure the Causes, Inc.

19.     Thomas owns stock in Cure the Causes, Inc.

20.     Cook is the founder and majority stock holder of Cure the Causes, Inc.

21.     Merci Dupre LLC is a Tennessee company formed on August 4, 2020 with a "Principal Address" identified as Jennifer Norton, 330 Franklin Road, Suite 135A-244, Brentwood, Tennessee 37027.

22.     Merci Dupre LLC is a single-member limited liability company.

23.     Merci Dupre LLC is "director managed."

24.     Cook is the "Director" and member of Merci Dupre LLC.

25.     Upon information and belief, Cook has transferred her personal assets and/or assets of her various other companies to Merci Dupre LLC in response to Metron's original Complaint in this action.

26.     Upon information and belief, Clayton Thomas has transferred his personal assets and/or assets of his various other companies to Merci Dupre LLC in response to Metron's original Complaint in this action.

27.     Upon information and belief, Cook has transferred personal assets to her various other companies in an attempt avoid collectability for this lawsuit.

28.     DC2 Holdings, LLC dba "DC2 Healthcare" was registered with the Tennessee Secretary of State on September 2, 2010 identifying 116 Wilson Pike Cir., Ste 240, Brentwood, TN 37027 as the "Principal Office" and "Mailing Address."

29.     DC2 Healthcare LLC dba "DC2 Healthcare" was incorporated on August 21, 2009 in Delaware.  Registered Agent Information is United States Corporation Agents, Inc., 221 N. Broad St., Suite 3A, Middletown, Delaware 19709.

30.     DC2 Holdings, LLC was incorporated on June 18, 2019 in Delaware.  Registered Agent Information is Harvard Business Services, Inc., 16192 Coastal Highway, Lewes, Delaware 19958.   Root Wellness, LLC is registered with the Tennessee Secretary of State identifying 116 Wilson Pike Cir., Ste 100, Brentwood, TN 37027 as the "Principal Office" and "Mailing Address."

31.     Root Wellness, LLC's registered agent is United States Corporation Agents, Inc., 5 Doctors Park, Cape Girardeau, Missouri 63703.

32.     Clayton Thomas ("Thomas") is the "Organizer" of Root Wellness, LLC.

33.     The Articles of Organization for Root Wellness, LLC identifies Thomas's address as 116 Wilson Pike Circle, Suite 100, Brentwood, Tennessee 37027.

34.     Clayton Thomas resides at 1704 Championship Blvd., Franklin, TN 37064.

35.     Thomas also resides with Cook.

36.     Thomas is an agent and/or has acted as an agent of Root Wellness, LLC.

37.     Thomas is an agent and/or has acted as an agent of Simply Wholeistic, Inc.

38.     Thomas is an agent and/or has acted as an agent of Dr. Christina Rahm, LLC.

39.     Thomas is an agent and/or has acted as an agent of Dr Christina Rahm Ventures Incorporated.

40.     Thomas is an agent and/or has acted as an agent of DC2 Healthcare LLC.

41.     Thomas is an agent and/or has acted as an agent of DC2 Holdings, LLC.

42.     Thomas is an agent and/or has acted as an agent of Cure the Causes, Inc.

43.     Thomas is an agent and/or has acted as an agent for Merci Dupre LLC.

44.     Cook is an agent and/or has acted as an agent of Root Wellness, LLC.

45.     Cook is an agent and/or has acted as an agent of Simply Wholeistic, Inc.

46.     Cook is an agent and/or has acted as an agent of Dr. Christina Rahm, LLC.

47.     Cook is an agent and/or has acted as an agent of Dr Christina Rahm Ventures Incorporated.

48.     Cook is an agent and/or has acted as an agent of DC2 Healthcare LLC.

49.     Cook is an agent and/or has acted as an agent of DC2 Holdings, LLC.

50.     Cook is an agent and/or has acted as an agent of Cure the Causes, Inc.

51.     Cook is an agent and/or has acted as an agent for Merci Dupre LLC.

52.     Mark Adams resides at 6001 Cervinus Run, Austin, Texas 78735.

53.     EnTox Solutions, LLC was formed on October 31, 2015.

54.     EnTox Solutions, LLC maintains or has maintained a principal place of business at 11380 Prosperity Farms Road, # 221E, Palm Beach Gardens, Florida 33410.

55.     EnTox Solutions, LLC maintains or has maintained a place of business at 6101 W. Courtyard Drive, Building 5, Suite 100, Austin, Texas 78730.

56.     EnTox Solutions, LLC's registered agent is Corporate Creations Network Inc., 5830 East 2nd Street, Casper, Wyoming 82609.

57.     Mark Adams is the President of EnTox Solutions, LLC.

58.     Mark Adams is the CEO of EnTox Solutions, LLC.

59.     Mark Adams is the managing member of EnTox Solutions, LLC.

60.     TOP Partners Management, LLC was formed on October 31, 2015.

61.     TOP Partners Management, LLC maintains the same principal place of business as EnTox Solutions, LLC:  11380 Prosperity Farms Road, # 221E, Palm Beach Gardens, Florida 33410.

62.     TOP Partners Management, LLC's registered agent is Corporate Creations Network Inc., 5830 East 2nd Street, Casper, Wyoming 82609.

63.     On September 8, 2017, Mark Adams signed under the penalty of perjury a "Limited Liability Company Annual Report" on behalf of TOP Partners Management, LLC confirming the mailing address and registered agent.

64.     Mark Adams is the managing member of TOP Partners Management, LLC.

65.     Jurisdiction and venue are proper in this Court because Thomas, Cook, and Adams contractually agreed with Metron that disputes related to agreements central to the claims

herein would be litigated pursuant to Ohio law and in the Cuyahoga County Court of Common Pleas.

66. This Court has personal jurisdiction over Defendants because Defendants purposefully available themselves to jurisdiction in Ohio by taking action and causing consequence in Ohio, specifically actions related to Metron.

67. Defendants' conduct giving rise to the claimed contained herein either occurred in Ohio and/or directly caused injury in Ohio.

68. Defendants' actions have a sufficiently substantial connection to Ohio making the exercise of personal jurisdiction over Defendants reasonable and constitutional.

69. Jurisdiction is proper because Defendants caused injury in Ohio and Defendants regularly do or solicit business and derive substantial revenue from goods/services consumed in Ohio.

70. Jurisdiction is proper because Defendants transact business in Ohio.

## FACTUAL ALLEGATIONS

71. Metron was formed on October 9, 2014.

72. Metron's business involves the research, development, and manufacture of dietary supplements, including but not limited to products containing zeolite clinoptilolite fragments.

73. Dr. Nikolaos Tsirikos-Karapanos is the owner and managing member of Metron.

74. Metron, through its founder Dr. Tsirikos-Karapanos, created the first and only water-soluble zeolite product, known as "Hydrolyzed Clinoptilolite Fragments" or "HCF."

75. HCF is a patented liquid zeolite formation—a water solution of water soluble zeolite clinoptilolite fragments.

9

76.    Metron owns the intellectual property for water-soluble clinoptilolite fragments as descried in U.S. Patent No. 9,629,874 ("Metron's First Patent") and in U.S. Patent Application Publication No. 2017/0182091.

77.    Metron owns the intellectual property of the production of water-soluble clinoptilolite fragments as described in U.S. Patent No. 10,206,948 ("Metron's Second Patent").

78.    On October 9, 2014, Dr. Tsirikos-Karapanos filed a Provisional Patent Application with the Title:  "Production of Water-Soluble Hydrolyzed Clinoptilolite Fragments and Nutraceutical Products based on Water-Soluble Hydrolyzed Clinoptilolite Fragments." ("Metron's Provisional Patent Application").

79.    Metron's Provisional Patent Application included a "Description of invention:" "HCF is a water solution of water-soluble and bio-absorbable mixture of zeolite clinoptilolite fragments.  It is produced hydrolyzing zeolite clinoptilolite under heating with the use of phosphoric acid."

80.    Metron's Provisional Patent Application, which led to Metron's First Patent, stated, "A two-stage hydrolysis reaction is required in order to produce HCF concentrate; the primary hydrolysis reaction and the secondary hydrolysis reaction" (the "Two-Step Process").

81.    The Two-Step Process was described only in Metron's Provisional Patent Application.

82.    Metron's Provisional Patent Application, and the Two-Step Process contained therein, was never available to the public.

83.    On October 23, 2014, Metron executed its initial Operating Agreement, under which Thomas was a "member" and equity holder.

10

84.     On October 24, 2014, Thomas executed a "Non-Solicitation, Confidentiality, and Non-Compete Agreement" with Metron ("Thomas NCA").

85.     By signing the Thomas NCA, Thomas acknowledged that Metron "has been engaged as a manufacturer, developer and supplier of nutraceutical products and has developed at great costs to the Employer both in dollars and mental and physical labor: operating procedures, customers, process, formulas, vendor relationships, and employees, which are vital to the Employer's continued operation."

86.     Under the Thomas NCA, Thomas agreed to keep "Confidential Information" confidential, as the term is defined in the NCA.

87.     By signing the Thomas NCA, Thomas expressly acknowledged "the sensitive and confidential nature of the Confidential Information, and the irreparable damage that would result to [Metron] if such Confidential Information is disclosed to third parties…"

88.     Upon information in relief, Thomas and Cook met sometime in 2015, or possibly earlier.

89.     Thomas and Cook started a relationship that also eventually rewarded Thomas with financial assistance and employment.

90.     In July of 2015, without Metron's knowledge, consent, or authorization—and in direct violation of Metron's Operating Agreement in effect at that time—Thomas started Personalized Health Solutions, LLC ("PHS"), a company in the business of selling and distributing zeolite products.

91.     Thomas was still a "member" of Metron when Thomas started PHS.

92.     On July 16, 2015, Cook entered into a Mutual Confidentiality Agreement with Metron ("Cook MCA," attached as Exhibit 1).

11

93.     The Cook MCA's stated purpose was to set forth the terms and conditions by which Metron and Cook agreed to disclose certain confidential information to the other party for the sole purpose of evaluating the possibility of future business relationships between the parties.

94.     The Cook MCA defined the term "Confidential Information" to include "any and all information…which is disclosed for the purpose of the Evaluation."    More specifically, "Confidential Information" expressly included "any information provided by Metron which references any Metron product and any Metron product related process including but not limited to process involving water-soluble hydrolyzed clinoptilolite fragments and any nutraceutical products based on water-soluble hydrolyzed clinoptilolite fragments shall always be considered 'Confidential Information.'"

95.     Cook agreed to protect the confidentiality of all Confidential Information.

96.     The Cook MCA restricted access to the Confidential Information to Cook's personnel engaged in relation to the Evaluation, and said personnel were required to observe the same provisions of confidentiality set forth in the Cook MCA.

97.     Under the Cook MCA, Cook was obligated to maintain confidence for a period of five years from the date of the Cook MCA.

98.     The Cook MCA contained a forum selection and choice-of-law provision which states, "This Agreement will be construed in accordance by the law of the State of Ohio and jurisdiction shall lie with Cuyahoga County Court of Common Pleas."

99.     Cook agreed to protect the confidentiality of the Confidential Information.

100.    Cook agreed to return or destroy all Confidential Information if requested by Metron or upon the completion of discussion between the parties, which event occurred first.

101.    On August 25, 2015, Thomas and Metron entered into a Separation Agreement, in which Thomas resigned his employment at Metron.  After that point, Thomas's relationship with Metron was that of an independent contractor.

102.    On August 31, 2015, Metron and Thomas entered into a Mutual Confidentiality Agreement ("Thomas MCA," attached as Exhibit 2).

103.    The Thomas MCA's stated purposed was to set forth the terms and conditions by which Metron and Thomas agreed to disclose certain confidential information to the other party for the sole purpose of evaluating the possibility of future business relationships between the parties.

104.    The Thomas MCA defined the term "Confidential Information" to include "any and all information…which is disclosed for the purpose of the Evaluation."   More specifically, "Confidential Information" expressly included "any information provided by Metron which references any Metron product and any Metron product related process including but not limited to process involving water-soluble hydrolyzed clinoptilolite fragments and any nutraceutical products based on water-soluble hydrolyzed clinoptilolite fragments shall always be considered 'Confidential Information.'"

105.    Thomas agreed to protect the confidentiality of all Confidential Information.

106.    The Thomas MCA restricted access to the Confidential Information to Thomas's personnel engaged in relation to the Evaluation, and said personnel were required to observe the same provisions of confidentiality set forth in the Cook MCA.

107.    Under the Thomas MCA, Thomas was obligated to maintain confidence for a period of five years from the date of the Thomas MCA.

13

108. The Thomas MCA contained a forum selection and choice-of-law provision which states, "This Agreement will be construed in accordance by the law of the State of Ohio and jurisdiction shall lie with Cuyahoga County Court of Common Pleas."

109. Thomas agreed to protect the confidentiality of the Confidential Information.

110. Thomas agreed to return or destroy all Confidential Information if requested by Metron or upon the completion of discussion between the parties, which event occurred first.

111. On September 5, 2015, Thomas contacted Larry Hopfenspirger, a Metron investor, in an effort to gain financial support for the creation of a "knock off" patent that copied Metron's patents, intellectual property, and/or trade secrets.

112. It was Thomas's desire, on September 5, 2015, to manufacture a water-soluble zeolite product that was a "knock off" of Metron's water-soluble zeolite product(s).

113. On October 6, 2015, Sozo Global, Inc. ("Sozo") and/or Mark Adams ("Adams") entered into a Mutual Confidentiality Agreement with Metron. ("Adams MCA," attached as Exhibit 3).

114. Sozo is a for-profit corporation located at 6101 W. Courtyard Dr., Building 5, Suite 100, Austin, Texas, 78730.

115. Sozo shares or has shared a place of business with EnTox Solutions, LLC.

116. Adams was/is the President, Chairman, and CEO of Sozo.

117. Adams signed the Adams MCA in order for Adams to gain access to Metron's Trade Secrets and then use Metron's Trade Secrets for individual gain.

118. The Adams MCA's stated purposed was to set forth the terms and conditions by which the parties agreed to disclose certain confidential information to the other party for the sole purpose of evaluating the possibility of future business relationships between the parties.

119.    The Adams MCA defined the term "Confidential Information" to include "any and all information…which is disclosed for the purpose of the Evaluation."   More specifically, "Confidential Information" expressly included "any information provided by Metron which references any Metron product and any Metron product related process including but not limited to process involving water-soluble hydrolyzed clinoptilolite fragments and any nutraceutical products based on water-soluble hydrolyzed clinoptilolite fragments shall always be considered 'Confidential Information.'"

120.    Adams agreed to protect the confidentiality of all Confidential Information.

121.    Under the Adams MCA, Adams was obligated to maintain confidence for a period of five years from the date of the Adams MCA.

122.    The Adams MCA contained a forum selection and choice-of-law provision which states, "This Agreement will be construed in accordance by the law of the State of Ohio and jurisdiction shall lie with Cuyahoga County Court of Common Pleas."

123.    Adams agreed to protect the confidentiality of the Confidential Information.

124.    Adams agreed to return or destroy all Confidential Information if requested by Metron or upon the completion of discussion between the parties, which event occurred first.

125.    By executing the Adams MCA, Adams obtained, learned of, and had access to Metron's Trade Secrets.

126.    Upon information and belief, Cook and Thomas and/or Adams (individually and/or by and through their various companies) were conspiring to create a "knock off" of Metron's product(s) with the use, aid, and assistance of Metron's intellectual property and trade secrets.

127.    When Adams signed the Adams MCA, Adams's plot, motive, and plan was to invest in, support, and acquire Metron's trade secrets and intellectual property rights in order to create and/or obtain a "knock off" of Metron's intellectual property and rights in a direct conflict with Metron's intellectual property rights

128.    Cook and Thomas and/or Adams (individually and/or by and through their various companies) intentionally misled Metron by obtaining from Metron information about Metron's Trade Secrets under the guise of wanting to engage in business with Metron.

129.    On October 9, 2015, Dr. Tsirikos-Karapanos filed a non-provisional patent application with the title: "PRODUCTION OF WATER-SOLUBLE HYDROLYZED CLINOPTILOLITE FRAGMENTS AND NUTRACEUTICAL PRODUCTS BASED ON WATER-SOLUBLE HYDROLYZED CLINOPTILOLITE FRAGMENTS." ("Metron's Non-Provisional Patent Application").

130.    Metron's Non-Provisional Patent Application was the result of significant expenses on part of Metron and countless hours of experimentation and preparation on the part of Metron and the inventor Dr. Nikolas Tsirikos-Karapanos.

131.    Metron's Non-Provisional Patent Application was not publicly available as of October 2015.

132.    On October 13, 2015, Thomas contacted Metron's intellectual property attorneys, stating that he was calling from Metron, and attempted to secure information regarding Metron's patents.

133.    On or before October 14, 2015, Thomas possessed a copy of Metron's Patent Application(s).

134.    In violation of Thomas's contractual duties to Metron, including the Thomas MCA, Thomas provided Cook with a copy of Metron's Patent Application(s).

135.    Cook accepted from Thomas a copy of Metron's Patent Application(s).

136.    Cook read Metron's Patent Application(s).

137.    Thomas read Metron's Patent Application(s).

138.    Adams read Metron's Patent Application(s).

139.    Cook transmitted, produced, and/or provided Metron's Patent Application(s) to third-parties without Metron's knowledge or consent.

140.    Thomas transmitted, produced, and/or provided Metron's Patent Application(s) to third-parties without Metron's knowledge or consent.

141.    Adams transmitted, produced, and/or provided Metron's Patent Application(s) to third-parties without Metron's knowledge or consent.

142.    Metron's Patent Applications contained trade secrets including scientific and technical information related to HCF and the production of hydrolyzed clinoptilolite fragments ("Metron's Trade Secrets").  Metron's Trade Secrets include information regarding the design, process, procedures, equipment, laboratory protocols, quality testing, devices, methods, and techniques in the production of water-soluble clinoptilolite fragments.

143.    Thomas learned of Metron's Trade Secrets, only and exclusively, through his direct dealings and communications with Metron and Dr. Tsirikos-Karapanos.

144.    Thomas visited Cleveland several times and, during his visits, stayed at Dr. Tsirikos-Karapanos' s residence.

145.    Thomas and Cook visited Metron in July of 2015.

146. Cook learned of Metron's Trade Secrets, in part, through her direct dealings and communications with Thomas, Metron, and Dr. Tsirikos-Karapanos while subject to the Cook MCA.

147. Adams learned of Metron's Trade Secrets, in part, through his direct dealings and communications with Thomas, Metron, and Dr. Tsirikos-Karapanos while subject to the Adams MCA.

148. When Cook received Metron's Patent Application(s), Cook knew it contained Metron's Trade Secrets.

149. When Cook received Metron's Patent Application(s), Cook knew Metron's Trade Secrets were the subject of reasonable efforts by Metron to maintain the secrecy of Metron's Trade Secrets.

150. Cook knew that Metron derived its independent economic value in the secrecy of Metron's Trade Secrets.

151. On or before October 14, 2015, Cook used Metron's Trade Secrets and Metron's Provisional Patent Application to create two Non-provisional Patent Applications (collectively, "Cook's Patent Applications") as identified below:

a. U.S. Non-provisional Patent Application Serial No. 14/882,47, filed October 14, 2015, which was later abandoned on March 5, 2018 ("Cook's First Patent Application").

b. U.S. Non-provisional Patent Application Serial No. US14/884,669, filed on October 15, 2015, which was never abandoned ("Cook's Second Patent Application").

152. Upon information and belief, Thomas participated in drafting Cook's Patent Applications.

153.    Upon information and belief, Adams financially supported, initiated, and/or otherwise participated in the creation of Cook's Patent Applications.

154.    On or before October 14, 2015—and unbeknownst to Metron—Cook, Thomas, and Adams conspired against Metron and participated in the creation of Cook's Patent Applications (a "knock-off" of Metron's Patent) with the intent to assign all rights related to the Cook's Patent Applications to Adams.

155.    Cook's Patent Applications identified Christina Rahm Cook as "First Named Inventor."

156.    Cook's Patent Applications copied the format, content, language, and information from Metron's Provisional Patent Application, including the Two Step Process, which were never available to the public.

157.    The Applicant and Assignee for Cook's Patent Applications was EnTox Solutions LLC located at 6101 West Courtyard Drive, Building 5, Suite 100, Austin, Texas 78730.

158.    At the time of Cook's Patent Applications, no entity called "EnTox Solutions, LLC" existed.

159.    Cook's First Patent Application identified the "Title of Invention" as "WATER-SOLUBLE ELECTROLYZED/HYDROLYZED CLINOPTILOLITE FRAGMENTS AND NUTRACEUTICAL, AND ENVIRONMENTAL PRODUCTS BASED THEREON."

160.    Under "Summary of Invention," Cook's First Patent Application identified the "present invention" as "a water-soluble electrolyzed and/or hydrolyzed clinoptilolite formulation, which can include, but not be limited to, the orally administered and absorbed in the gastrointestinal (GI) tract or environment…"

19

161.    Cook's First Patent Application stated the "methods of making water-soluble hydrolyzed clinoptilolite fragments….include performing a primary hydrolysis reaction by hydrolyzing clinoptilolite with or without electrolysis with an acid and separating the primary hydrolysis reaction into a first liquid portion and first solid portion, the first liquid portion including a primary hydrolysis reaction product including water-soluble hydrolyzed clinoptilolite fragments."

162.    Cook claims to have a Ph.D. in Education, Counseling Psychology from the University of Sarasota.

163.    Cook has no formal education or degrees in nutrition, laboratory sciences, chemistry, biochemistry, biology, medicine, engineering, or pharmacology.

164.    Cook never studied laboratory sciences, chemistry, biochemistry, medicine, or pharmacology at an accredited college or university.

165.    When Cook filed Cook's First Patent Application, Cook lacked the technical expertise to fully understand let alone "invent" any of the processes described in Cook's Provisional Patent Application.

166.    On October 14, 2015, Adams and/or EnTox Solutions, LLC entered into a Contribution Agreement with Cook ("Contribution Agreement," attached as Exhibit 4).

167.    Under the Contribution Agreement, Cook assigned Adams and/or EnTox Solutions, LLC Cook's right, title and interest in "the subject matter referred to in Exhibit A (the "Technology").  Exhibit A to the Contribution Agreement defined "Technology" as "any and all applications of zeolites, whether naturally occurring or synthetic in origin, including without clinoptilolite."

168.    Under the Contribution Agreement, Cook assigned Adams and/or EnTox Solutions, LLC Cook's right, title and interest in "all copyrights, patent rights, trade secret rights, trademark rights, mask works rights, sui generis database rights, and all other intellectual and industrial property rights of any sort and all business, contract rights, causes of action, and goodwill in, incorporated or embodied in, used to develop, or related to any of the foregoing (collectively, the "Subject Intellectual Property").

169.    Adams paid Cook financial consideration of an unknown and undisclosed amount in exchange for the above-referenced assignment.

170.    Adams signed the Contribution Agreement as "President and Chief Executive Officer" of EnTox Solutions, LLC.

171.    Cook signed the Contribution Agreement on her own behalf.

172.    On October 15, 2015, Adams executed an Assignment ("Assignment" attached as Exhibit 5) as a "Duly authorized agent of Christina Rahm Cook."  In the Assignment, EnTox Solutions LLC was identified as a "Wyoming limited liability corporation" having a place of business at 6101 W. Courtyard Drive, Building 5, Suite 100, Austin Texas 78730—the same business address as Sozo Global, Inc.

173.    When Adams executed the Assignment, EnTox Solutions, LLC did not exist.

174.    The Assignment identified Mark Adams as President and CEO of EnTox Solutions LLC.

175.    The Assignment stated it was "executed and effective as of October 14, 2015."

176.    Adams gave Cook "good value and consideration" in exchange for an assignment of "all improvements and inventions which are disclosed in the non-provisional patent application for United States Letters Patent, Serial No. 14/884,669, filed October 15, 2015, and is

entitled <u>Water-Soluble Electrolyzed Clinoptilolite Fragments And Nutraceutical, Pharmaceutical, And Environmental Products Based Theron</u>…"

177.    On or around the time when Adams was executing the Contribution Agreement and the Assignment, Adams was also engaging in business and pursuing a business relationship with Metron.

178.    Adams represented himself as a "friend" of Metron.

179.    Adams never told Dr. Tsirikos-Karapanos or Metron about the Assignment or the Contribution Agreement with Cook.

180.    Adams never told Dr. Tsirikos-Karapanos or Metron about his dealings with Cook and/or Cook's various companies.

181.    Adams never told Dr. Tsirikos-Karapanos or Metron about his dealings with Thomas and/or his various companies.

182.    On October 30, 2015, Metron and Sozo executed an Exclude Distribution and Supply Agreement ("Sozo EDA," attached as Exhibit 5).  Adams signed the Sozo EDA as "Chairman and Chief Executive Officer" of Sozo.

183.    The Sozo EDA gave Sozo and/or Adams exclusive rights to distribute Metron's Product as defined in the Sozo EDA in exchange for Sozo's agreement to purchase certain quantities of Metron's Product over a ten year period.

184.    The term of the Sozo EDA was 120 months and automatically extended for an additional five years, unless Metron or Sozo gives notice of termination in accordance with the Sozo EDA.

185.    The minimum purchase order under the Sozo EDA was 25,000 bottles of Metron's product at $5.90 per bottle.

186.     Metron had an reasonable expectation that Sozo's purchase orders could and would exceed 500,001 bottled, and Metron provided Sozo with discount pricing of $5.50 per bottle at such quantity.

187.     To maintain exclusivity, Sozo agreed to purchase Metron's product from Metron at quantities and timetables set forth in the Sozo EDA.

188.     Thomas, Cook, and Adams (individually and by and through their various companies) conspired to interfere and did, in fact, interfere with the performance of Metron's EDA.

189.     Defendants actions, as described herein, proximately caused Sozo's nonperformance under the Sozo EDA and resulted in  to interfere and did, in fact, interfere with the performance of Metron's EDA.

190.     Adams misrepresented to Metron, on multiple occasions, that he was not working with or cooperating with Thomas or Cook.

191.     Adams outright lied to Dr. Tsirikos-Karapanos, on multiple occasions, about his dealings with Cook and Thomas.

192.     Nine days after Adams signed the Adams MCA, Cook assigned her purported intellectual property to Adams.

193.     For example, on or around March 3, 2016, Adams assured Metron by his email to Dr. Tsirikos-Karapanos that neither he nor Sozo were cooperating with Thomas in any way.

194.     In reality, and unbeknownst to Metron at the time, Adams (individually and/or by and through his companies) was strongly cooperating with and communicating with Thomas and/or Cook regarding information Dr. Tsirikos-Karapanos provided to Adams, including but not limited to Metron's Trade Secrets.

195.    On April 2, 2016, Dr. Tsirikos-Karapanos asked Adams whether Adams or anyone else at Sozo was cooperating with Thomas.  Adams assured Dr. Tsirikos-Karapanos, again, that he was not cooperating with Thomas.

196.    On April 21, 2016, Adams sent Dr. Tsirikos-Karapanos an email.  In that April 21st email, Adams asked questions and made statements based upon information Adams learned from Clayton Thomas.

197.    Adams's April 21st email stated, in part: "Is there any truth to the info I received today that Jeunesse has filed and 'received' an injunction against Metron?  If so, what does this mean for Metron supply relationship with SOZO?  Is there any truth to the rumor that Metron is working a deal to sell Cytodetox product to a new group that Warren [Phillips] is brokering the deal to? "

198.    Although Adams's April 21st email contained information Adams received from Thomas, Adams gave the impression that he was *not* working or cooperating with Thomas or Cook.

199.    "Clayton [Thomas] is all over the Internet selling his clinoptilolite product.  This directly competes with Metron.  I sent you a recent Facebook post.  When will you be successful in stopping this behavior?"    Adams further stated, "We have to shut Clayton down!!"

200.    Dr. Tsirikos-Karapanos replied to Adams's April 21st email the same day stating, in part:  "Based on the email that I just received from you it seems that SOZO is still listening to Thomas.  This is a serious problem and will stop immediately.  With this SERIOUS situation in place Metron will NOT continue to work with SOZO."

201.    On April 22, 2016, Adams replied to Dr. Tsirikos-Karapanos representing, "…I can assure you I am not…nor is ANY member of by staff…working with Thomas…."

24

202.    In  the  April  22nd  email,  Adams  also  stated,  "**We have common enemies**…**Clayton [Thomas], Christina [Rahm Cook]**, Life Health Sciences and Jeunesse. You and I...and SOZO…and Metron are friends!!"

203.    Adams did not inform Metron that he had entered in the Contribution Agreement with their "common enemy," Cook.

204.    Adams did not inform Metron that he had executed the Assignment as a duly authored agent of EnTox Solutions, LLC with Metron's "common enemy," Cook.

205.    On April 23rd, Adams participated in a telephone conference with Metron representatives, including Dr. Tsirikos-Karapanos, during which, Adams represented and assured Dr. Tsirikos-Karapanos that he had no cooperation with Thomas or Cook.  Metron accepted Adams's written and verbal representations and reasonably relied upon Adams' written and verbal representations to Metron's detriment.

206.    Metron continued to correspond, cooperate, and engage in business dealings with Adams and/or Adams various companies as a result of Adams's denial of working with Thomas or Cook.

207.    Based upon Adams's intentional and fraudulent assurances, Metron continued to expend considerable time and resources pursuing a business relationship with Adams and Sozo without any knowledge that Adams (individually or by and through his companies) had entered into contracts and engaged in business dealings with Cook, Thomas, and/or their various companies.

208.    Adams knew that Cook was not the "inventor" of Metron's HCF or any other zeolite product.

209.     Adams knew that Cook's Patent Applications were copied from Metron's patents and patent applications.

210.     Adams knew Cook lacked the education and technical expertise to "invent"—let alone create—water soluble zeolite products, including clinoptilolite fragments.

211.     Cook, an alleged "inventor" of nutraceutical products, boasts that she is a doctor, "Dr.", and provides "health and wellness consulting" to "cure the cause". *See*, www.drchristinacook.com ("Cook Website").

212.     Cook, Thomas, and/or other Defendants maintained and/or controlled the content contained on the Cook Website.

213.     The Cook Website contains a purported recommendation from Clayton R. Thomas as "President" of "Personalized Healthcare Solution," which stated:  "Dr. Christina Rahm Cook provides a level of insight, **clinical knowledge**, and business acumen not found anywhere else."

214.     Cook has no clinical knowledge and never provided clinical care to anyone.

215.     Cook has no patients.

216.     On the Cook Website, Cook offered "Consulting Services" in five different categories:  Life ($250), Wellness ($250); Relationship ($250); Environment ($500); and Corporate ($500).

217.     Under Cook's "Wellness Consultation," Cook offers potential customers the following:



218.     Upon information and belief, Cook incorporates, utilizes, and/or discloses Metron's Trade Secrets during her consulting sessions offered to Cook's customers.

219.     Cook never took any course in medicine at Charter University because pursuant to Charter University policy, such courses are not offered.

220.     Cook claims on other websites to have a focused "Doctor of Philosophy" in "Strategic Sciences" from Charter University, which is not a public or nationally accredited university.

221.     Per Charter University policy, no medicine or similar health related subjects are available for study via Charter University.

222.     As of October 14, 2015, Cook had no education, training, or experience drafting patent applications.

---

[1] https://drchristinarahmcook.com/product/wellness-consulting/

223.    As of October 14, 2015, Cook had no education, training, or experience inventing nutraceutical products using zeolites or clinoptilolite.

224.    The Cook Website states, "Dr. Cook has created multiple provisional patents and proprietary formulas."[2]

225.    Cook never created and does not own any "proprietary formulas."

226.    After Metron filed this lawsuit, Cook unregistered the Cook Website, eliminating all content and postings previously available on the Cook Website.

227.    After    Metron    filed    this    lawsuit,    Cook    formed    the    website www.drchristinarahm.com ("Rahm Website"), which promotes "Cure the Cause" – a Personalized Detoxification Program.

228.    According to the Rahm Website, Cook now goes by "Dr. Rahm."

229.    Under the "Meet Dr. Rahm" tab, the Rahm Website represents that Cook has multiple doctorate degrees, including "Doctorate Degree in Counseling Psychology" and a "Doctorate Degree in Strategic Science."[3]

230.    The Rahm Website represents that Cook participated in "post Doc work from Harvard University" in nanobiotechnology.

231.    Cook has never taken a course at Harvard University or received any academic credits from Harvard University.

232.    The Rahm Website represents that Cook "lectured" in continued medical education courses for John Hopkins.

---

[2] https://drchristinarahmcook.com/meet-dr-cook/
[3] https://drchristinarahm.com/meetdrrahm/

233.    The Rahm Website represents that Cook "lectured in many settings…in the areas of Oncology, Orthopedic Surgery, and Neurosurgery."

234.    The Rahm Website represents that Cook "worked as a formulator and product science researcher for companies including Pfizer, Johnson & Johnson, Jansen, Biogen, Idec, and Alexion.

235.    The Rahm Website represents that Cook "has created multiple provisional patents and proprietary formulas."

236.    The Rahm Website represents that Cook is a "CEO of multiple companies" and "Chair on the Board of Directors for many companies[,] foundations[,] and societies."

237.    The Rahm Website contains a "testimonial" from Thomas identified as "President of Personalized Healthcare Solution."

238.    The Rahm Website identifies a business address for "Dr. Rahm" as 330 Franklin Rd., Suite 135A-244, Brentwood, Tennessee 37027.

239.    Without access to Metron's Provisional Patent Application and/or Metron's Non-Provisional Patent Application, Cook would not have been able to submit Cooks' Patent Applications.

240.    Large portions of Cook's Patent Applications were copied directly from Metron's Provisional Patent Application and/or were re-worded with little to no modification in form or substance.

241.    Cook and Thomas conspired to misappropriate—and did, in fact, misappropriate—Metron's Trade Secrets for their own financial gain and to the detriment of Metron.

242.   By filing Cook's Patent Applications, it was the goal of Cook and Thomas to use Cook's Patent Applications to further the manufacture, marketing, promotion, sale, and distribution of one or more water-soluble clinoptilolite products—or purported water-soluble clinoptilolite products—that were "knock-offs" of Metron's product(s).

243.   Cook, Thomas, Adams and/or other Defendants conspired to misappropriate Metron's Trade Secrets for their own financial gain and to the detriment of Metron.

244.   Metron incurred costs and expenses, including reasonable attorneys' fees related to assessing and evaluating legal options, related to Cook's Patent Applications.

245.   Cook and/or Thomas and/or Adams, by and through their various companies, continue to seek extensions by appealing rejections at the Patent Trial and Appeal Board (PTAB), and as such advertised, sell, and continue to advertise and sell water-soluble clinoptilolite products—or purported water-soluble clinoptilolite products marketed as Cook's "patent pending" products.

246.   On  February 22, 2016, Metron filed a Verified Complaint for Temporary Restraining Order against Thomas seeking compensatory and equitable relief in the Court of Common Pleas Case No. CV-16-859345 before Judge Michael J. Russo (the "Thomas Lawsuit").

247.   At the time Metron filed the Verified Complaint, Thomas was the President of Personalized Healthcare Solutions, LLC.

248.   On May 11, 2016, Judge Russo in the Thomas Lawsuit granted Metron's Motion for Temporary Restraining Order and Preliminary Injunctive Relief.

249.   On June 6, 2016 Judge Michael Russo issued a Judgment Entry and Order from Cuyahoga County Case No. CV-16-859345 permanently enjoining Clayton Thomas from:

a.      Utilizing Metron's name, confidential information, Metron's trade secrets, and proprietary information for any purposes.

b.      Cooperating with, contracting with, negotiating, soliciting, diverting, or interfering with any company Metron has contracted with related to hydrolyzed zeolites.

c.      Accepting employment with, participating in a company, consulting, or contracting with any individuals or entities manufacturing, selling, or dealing with zeolite products.

d.      Supporting, advising, or participating with or in any future or ongoing business that is adverse or competitive with Metron, specifically as to zeolites, including but not limited to enjoining Thomas from any cooperating with or involvement in a company that is manufacturing, producing, selling, or distributing zeolites.

250.    On July 18, 2016, counsel for Metron sent a letter to Cook informing Cook of Judge Russo's June 6, 2016 Judgment Entry and Order.

251.    Metron requested that Cook tell Metron the extent of her involvement with Thomas related to any zeolites product as well as her future intentions with any ongoing business activities in the zeolites space.

252.    Cook ignored Metron's July 18, 2016 letter.

253.    Despite knowledge of Judge Russo's Order and her contractual obligations to Metron, Cook continued business dealings with Thomas, which including developing and selling one or more products claiming to contain water-soluble clinoptilolite fragments, which were a "knock-off" of Metron's product(s) and were based upon Metron's Trade Secrets.

254.    Cook was aware that Thomas's actions were unlawful, yet continued to participate in and financially support Thomas's efforts in developing, manufacturing, marketing,

selling, and distributing one or more products purporting to contain water-soluble clinoptilolite fragments, which were a "knock-off" of Metron's product(s) and were based upon Metron's Trade Secrets.

255.    On August 29, 2016, the Court in the Thomas Lawsuit granted civil contempt against Thomas.

256.    On October 11, 2016, the Court in the Thomas Lawsuit found Thomas in criminal contempt of Court for violating court orders.

257.    On April 21, 2017, a Journal Entry in the Clayton Thomas Lawsuit held that Thomas, "remains in contempt of Court, has made no efforts to purge himself of contempt, and continues to participate in activities from which he was enjoined in the Court's June 6, 2016 Order. Mr. Thomas is ordered remanded to the Cuyahoga County jail to serve three days of imprisonment. The remaining 127 days of imprisonment ordered by the Court on 10/11/2016 and 11/30/2016 are suspended on the condition that Mr. Thomas pays the original fine of $250 from 10/11/2016 and refrains from the actions from which he was enjoined on 06/06/2016. If Mr. Thomas pays the fine of $250 from 10/11/2016, the court will suspend the fine of $1000 that it Ordered on 11/30/2016. Mr. Thomas is ordered to be released on Monday, 04/24/2017."

258.    Per Court Order and Stipulation, Clayton Thomas and his company Personalized Healthcare Solutions (PHS) were bound by the following Order until June 17, 2019, in pertinent part:

    ***

    3.      Defendant, Clayton Thomas, shall have zero ownership or receive any
            financial remuneration from and shall not consult for any company
            involved in any zeolite based production, manufacturing, distribution,
            marketing or sales until June 17, 2019. Defendant shall not advertise for
            any specific zeolite based products until June 17, 2019. Defendant may
            talk publicly about zeolites, but shall never mention Plaintiff. Defendant

shall not mention Plaintiff's customer's product or express until June 17, 2019, the benefit or preference or make any comparison of any type of any zeolite product over others that are related to Metron's or to Dr. Tsirikos-Karapanos intellectual property which include, but are not limited to, hydrolyzed zeolite fragments or hydrolyzed clinoptilolite fragments or water soluble zeolite fragments or water soluble clinoptilolite fragments or water solutions of water soluble zeolite fragments or water solutions of water soluble clinoptilolite fragments.

4.      Defendant PHS, by and through its owners, employees, or agents, was temporarily enjoined from all items listed below, and from the date listed below, he is now permanently enjoined from:

      a.      Utilizing Metron's confidential information, trade secrets, and proprietary information;

      b.      Cooperating with, contracting with, negotiating, soliciting, diverting, or interfering with any company Metron has contracted with related to hydrolyzed zeolites;

      c.      Participating in a company, consulting, or contracting with any individuals or entities manufacturing, selling, or dealing with zeolite products; and

      d.      Supporting, advising, or participating with or in any future or ongoing business that is adverse and/or competitive with Metron, specifically as to zeolites, including but not limited to enjoining Thomas from any cooperating with or involvement in a company that is manufacturing, producing, selling, or distributing zeolites.

5.      Defendants Clayton Thomas and PHS are hereby ordered to terminate and shutdown  https://www.gofundme.com/tbktrs5u  all internet sites selling hydrolyzed zeolite products stolen and/or taken from Metron or Metron's packager;

***

7.      Defendants Clayton Thomas and PHS are hereby ordered to immediately terminate and shut- down any part of any additional internet page selling any of Metron's hydrolyzed zeolite product and/or publishing any of Metron's trade secrets and confidential information about hydrolyzed zeolites;

8.      Defendants Clayton Thomas and PHS are hereby ordered to immediately terminate and shut- down any part of any additional internet page selling any zeolite product. Any such website shall not operate or function in any way until June 17, 2019.

259.    On April 25, 2017, Metron's Non-Provisional Patent Application was approved by the U.S. Patent and Trademark Office and was assigned Patent No. 9,629,874. ("Metron's First Patent").

260.    Metron's First Patent applied retroactively to the date Metron filed Metron's First Patent Application on October 9, 2014.

261.    Metron also holds U.S. Patent No. 10,206,948 entitled "Production of water-soluble clinoptilolite fragments" ("Metron's Second Patent").

262.    On and prior to 2017, a product called Vitality Detox Drops ("Vitality") was promoted, in part, through the website vitalitydetoxdrops.com. ("Vitality Website").

263.    Upon information and belief, Thomas and/or Cook maintain the Vitality Website and/or control its contents.

264.    According to the Vitality Website, Vitality purports to contain water-soluble clinoptilolite fragments.

265.    Cook participated in the creation, promotion, manufacture, marketing, sale, and/or distribution of Vitality.

266.    DC2 Holdings, LLC and/or its member(s) participated in the creation, promotion, manufacture, marketing, sale, and/or distribution of Vitality.

267.    DC2 Healthcare, LLC and/or its member(s) participated in the creation, promotion, manufacture, marketing, sale, and/or distribution of Vitality.

268.    Defendants, collectively and/or individually—and/or its agents and employees participated in the creation, promotion, manufacture, marketing, sale, and/or distribution of Vitality.

34

269.    Thomas participated in the creation, promotion, manufacture, marketing, sale, and/or distribution of Vitality.

270.    Cook—either directly or through her companies—profited from the sale of Vitality.

271.    Thomas—either directly or through his companies—profited from the sale of Vitality.

272.    Upon information and belief, Cook and Thomas were involved in the manufacture, promotion, sale, marketing of Vitality.

273.    The website for Vitality describes the product as "Hydrolyzed Liquid Zeolite" and admits that Vitality is a water-soluble zeolite containing "Clinoptilolite Fragments."

274.    The Vitality Website claims Vitality Detox Drops are "a one of a kind hydrolyzed liquid zeolite, currently patent pending, and the most advanced technology for delivering a safe and non-toxic zeolite product systematically….These fragments are a lot smaller than other zeolite formulas on the [sic] available on the market."

## What is Vitality Detox Drops?

It is a one of a kind hydrolyzed liquid zeolite, currently patent pending, and the most advanced technology for delivering a safe and non-toxic zeolite product systemically, so the body can function properly again. These fragments are a lot smaller than other zeolite formulas on the available on the market. They have the ability to passively cross membranes in the body, including the blood-brain barrier.[4]

275. The Vitality Website also claims, "These water-soluble fragments are over a million times smaller than other zeolite formulas available."

276. The Vitality Website also claims, "The patent pending Vitality Detox Drops molecule is the most advanced and safe water-soluble liquid Zeolite product available on the market."

---

[4] https://vitalitydetoxdrops.com/?v=7516fd43adaa

## What is VITALITY Detox Drops (Clinoptilolite Fragments)?

VITALITY Detox Drops is a one of a kind hydrolyzed (water-soluble) liquid zeolite solution. VITALITY Detox Drops has a honeycomb, cage structure and a natural negative charge that acts like a magnet. It binds toxins to the cage structure. These bound toxins are neutralized while they are still in your system and moved out of the body through the normal elimination channels.

These water-soluble fragments are over a million times smaller than other zeolite formulas available. They have the ability to passively cross membranes in the body, including the blood-brain barrier. VITALITY Detox Drops is the gold standard of liquid zeolite formulations and may just be the gold standard for systemic detoxification of heavy metals and environmental toxins.[5]

277.    The Vitality Website claims, "Fortunately, the scientific breakthrough of Vitality Detox Drops Hydrolyzed Liquid Zeolite solution is now available.  Our proprietary patent pending technology for a safe, bio-available, systematic delivery is the most advanced formula available today!"

278.    Cook never informed Metron nor paid Metron a reasonable royalty for using Metron's Trade Secrets to manufacture, market, promote, sell, or distribute Vitality.

---

[5] https://vitalitydetoxdrops.com/about-vitality/?v=7516fd43adaa

37

279.    On or around September 2018, Thomas and/or Cook submitted urine samples to Access Medical Labs under the client name:  "Root Detox Drops."   Access Medical Labs issued a final report on September 27, 2018.

280.    On February 5, 2019, Simply Wholeistic, Inc. filed its Articles of Incorporation with the Tennessee Secretary of State.  Kline Preston is the registered agent located at 4515 Harding Pike, Suite 107, Nashville, Tennessee 37205.  Simply Wholeistic shares that same principal office located at 4515 Harding Pike, Suite 107, Nashville, Tennessee 37205.

281.    "Root, Inc." is the assumed corporate name for Simply Wholeistic, Inc.

282.    Clayton Thomas signed the Application for Registration of Assumed Corporate name on April 2, 2019 as the "Chief Marketing Officer" for Simply Wholeistic, Inc.

283.    Cook is a principal, employee, and/or agent for Simply Wholeistic, Inc.

284.    Thomas is a principal, employee, and/or agent for Simply Wholeistic, Inc.

285.    Under the name "ROOT," Thomas and/or Cook advertise Simply Wholeistic, Inc. and/or Root Wellness, LLC as a multi-level marketing company ("Thomas/Cook MLM").

286.    Information about the Thomas/Cook MLM is contained on the website therootbrands.com (the "Root Website").

287.    Thomas and/or Cook maintain the Root Website and/or control the content contained on the Root Website.

288.    The Root Website does not provide any information about who runs the Thomas/Cook MLM or what individuals or entities own the Thomas/Cook MLM.

289.     The Thomas/Cook MLM has a compensation plan that revolves around affiliates purchasing certain products, in which commissions are paid as affiliates recruit other who do the same.

290.    The Thomas/Cook MLM has 44 affiliate ranks within its compensation plan.

291.    Upon information and belief, Thomas and Cook receive a portion of all sales made by affiliates of the Thomas/Cook MLM.

292.    Users who attempt to purchase products from the Root Website are directed to the same registration form that appears when a user clicks on the button entitled "want to become part of the story?"

293.    The Root Website advertises the products available to purchase on the Root Website as "remedies," specifically, "ROOT remedies are here to help retrain our bodies to detox, cleanse, focus, and relax in a more natural, less synthetic ways."

294.    On April 19, 2019, Callitas Health, Inc. issued a press release announcing its letter of intent with Simply Wholeistic, Inc., a Tennessee corporation.  According to the press release, Simply Wholeistic has a "detox product" that is to be ready for purchase in Spring of 2019.

295.    According to the press release, Simply Wholeistic, Inc. was formed in January 2019.

296.    According to the press release, Cook "formulated" each product manufactured and sold by Simply Wholeistic, Inc., and Clayton Thomas is identified as the "CEO" and "Owner" of Simply Wholeistic, Inc.

297.    Clayton Thomas is the Registered Agent for Simply Wholeistic, Inc.

298.    On numerous Facebook posts, public statements, and/or promotional materials, Thomas indicated his intent to sell and distribute CleanSlate worldwide.

299.    On April 20, 2019, Thomas authored a Facebook post using hashtag "#backtoyour roots."

300.     On May 6, 2019, Thomas authored a Facebook post stating Thomas was "soon to be launching a project" related to direct selling and multi-level marketing.

301.     On July 26, 2019, Root Wellness, LLC was formed by filing with the Missouri Secretary of State.   The registered address was 1213 N. Kingshighway St., Suite 102, Cape Girardeau, Missouri, 63703.

302.     Upon information and belief, Thomas is a member of Root Wellness, LLC.

303.     Upon information and belief, Cook is a member of Root Wellness, LLC.

304.     Upon information and belief, Thomas and Cook share in the profits generated by Simply Wholeistic, Inc.

305.     Upon information and belief, Adams and/or Adams's various companies receive a portion of profits generated by Simply Wholeistic, Inc.

306.     Upon information and belief, Thomas and Cook share in the profits generated by Root Wellness, LLC.

307.     Upon information and belief, Adams and/or Adams's various companies receive a portion of profits generated by Root Wellness, LLC.

308.     On October 12, 2019, Thomas and Cook attended an event in Las Vegas.

309.     On October 15, 2019, Thomas authored a Facebook post that included a picture of Thomas and Cook with the caption: "What happens in Vegas doesn't always stay in Vegas.  A great few days meeting with great friends and ROOT community members.  Can't wait to have more time in front of people with my 'partner'."

310.     The Vitality Website has a "Blog," which publishes numerous articles related to water-soluble zeolite and water-soluble clinoptilolite fragments, including the following Blog Posts:

      a.      "**Zeolite** Detoxification," January 21, 2019.

      b.      "Mitigating Impacts of Contaminated Drinking Water with **Soluble Zeolite**," October 7, 2019.

      c.      "Why the Structure of **Soluble Zeolite** is so Effective at Removing Toxins," August 16, 2019.

      d.      "**Soluble Zeolite** Helps Hormones Get Back on Track," July 30, 2019.

311.    Thomas and/or Cook authored and or participated in the authorship of the above Blog posts and all other blog posts published on vitalitydetoxdrops.com, including but not limited to those stated herein.

312.    The blog post entitled "Zeolite Detoxification," published on January 21, 2019 stated the following:

> This ability to create a product capable of reaching these parts of the body **took a deep understanding of chemistry and pharmaceutical science** to create a process of cryogenic fracking and thermal shock which breaks down the structure of the zeolite mineral into small **solubilized Clinoptilolite fragments that are water-soluble** and capable of crossing cell membranes. This includes the GI tract, adipose and tissue cells as well as the blood brain barrier, central nervous system and mitochondrial walls allowing these amazing particles to get into the most important parts of the body where these toxins are sequestered to have them bound and passively removed.

> This process is **proven scientifically with pharmaceutical level testing** such as **Liquid Chromatography Mass Spectroscopy** analysis and independent research by leading physicians in the field of heavy metal detoxification. The ability to detoxify the body has changed and become very simple.  A few drops two times daily and you are on your way. Furthermore, the natural negative charge of the mineral is enhanced through a unique and proprietary polarization process which significantly enhances the negative charge of the crystal making it more effective at binding toxins as well as enhancing the energy potential of the crystal.

If systemic detoxification is your desire and you understand the power of zeolites and their ability to bind and remove heavy metals, environmental toxins and other chemicals, you might want to consider trying out **Vitality Detox Drops**.[6]

313.    The "deep understanding of chemistry and pharmaceutical science" as stated in the above blog post was possessed by Dr. Tsirikos-Karapanos, not Thomas or Cook.

314.    Neither Thomas nor Cook have any formal education in chemistry, biology, biochemistry, or pharmaceutical science.

315.    Dr. Tsirikos-Karapanos has formal education in chemistry and pharmaceutical science.

316.    At the time of this blog post, any knowledge Cook or Thomas had regarding the "scientifically proven process," the "pharmaceutical level testing," or breaking down a clinoptilolite into water-soluble fragments came from Cook's and Thomas's interactions with Dr. Tsirikos-Karapanos and/or access to Metron's Trade Secrets.

317.    The "scientifically proven" "process" referenced in the above blog post was the process developed by Metron and Dr. Tsirikos-Karapanos, which was subject to the Cook MCA and the Thomas MCA.

318.    Thomas and/or Cook never developed or performed "pharmaceutical level testing" for any product.

319.    On February 2, 2019, Cook authored an article entitled "CBD, Zeolite, and Getting Rid of Heavy Metal," published on methanedetox.com.[7]

320.    In the above article, Cook writes about "Detoxification by Zeolites" and states,

According to Cook (1), experts and scientists have tried to create commercially available environmental products and nutraceutical products with a simple water

---

[6] https://vitalitydetoxdrops.com/2019/01/zeolite-detoxification/?v=7516fd43adaa

[7] http://methanedetox.com/cbd-zeolite-and-getting-rid-of-heavy-metal/

suspension for zeolites. **None of these attempts have successfully broken down the elements needed to allow for intracellular absorption of clinoptilolite**. However, some scientists have managed to deduce a method to produce fragments of water-soluble hydrolyzed zeolite as well as nutraceutical products that are based on hydrolyzed and water-soluble clinoptilolite. As argued by Cook, these fragments weigh between 218 and 620 Daltons that limits its capability to be used as a nutraceutical body detoxifier (2).

321.    The above article, expressly omits any mention to Dr. Tsirikos-Karapanos, his work and inventions, Metron, Metron's work, Metron's patents, or any of the products Metron manufactured that contained water-soluble clinoptilolite fragments.

322.    The above article does cite Cook's Patent Applications, which were a "knock off" of Metron's Non-Provisional Patent Application and was based upon Metron's Trade Secrets.

323.    Cook published the substantively same article on Linkedin.com with a different title, "How Hydrolyzed, Water Soluble, Full Spectrum CBD Oil and Zeolites Detox the Body and Impact Health by Dr. Christina Rahm Cook."[8]

324.    On December 3, 2019, Thomas and/or Cook authored or participated in the authorship of an article entitled "Goodbye Ritalin, Hello Zeolite Detoxifying ADHD" published on vitalitydetoxdrops.com.[9]  In the article, Thomas is identified as an "industry expert in the field of toxicology."  In the article, Thomas attributed rise in ADHD in children to toxicity.

325.    The above article promotes "Vitality Detox Drops" "a form of non-soluble zeolite is proven to effectively bind and remove heavy metal toxins and more."

---

[8] https://www.linkedin.com/pulse/how-hydrolyzed-water-soluble-full-spectrum-cbd-oil-detox-rahm-cook/
[9] https://vitalitydetoxdrops.com/2019/12/goodbye-ritalin-hello-zeolite-detoxifying-adhd/?v=7516fd43adaa

326.    On December 12, 2019, Clayton Thomas authored a Facebook post promoting "Root Wellness" and the website therootbrands.com.  Thomas wrote "You can order now to get bottles to test…We launch in January."

327.    "Root Wellness" also has an account on Facebook, Twitter, Instagram, and YouTube.  Root Wellness promotes the sale of Root CleanSlate on many internet and media platforms.

328.    None of the promotional materials on the Root Website or related to Root Wellness or Root CleanSlate credit Metron and Dr. Tsirikos-Karapanos as the inventor or sole intellectual property holder.

329.    The product "Root CleanSlate" became available for sale on the Root Website on or around January 2020.

330.    The Root Website advertises that CleanSlate "uses Zeolite, nature's best detoxifying mineral, in a proprietary patent pending formulation, to help wipe your cells clean of toxins trying to take them over."

331.    The "Supplement Facts" provided for CleanSlate is "Clinoptilolite Zeolite 300 mcg."  "Other ingredients include:  Water, Potassium Sorbate, Ascorbic Acid."

332.    Videos, publications, and/or promotional materials have identified Cook as a "ROOT formulator," including the below screen-shot:



Dr. Christina Rahm Cook
ROOT Formulator

333.    CleanSlate sells for $69 for a 1 fl. oz. bottle.

334.    CleanSlate is coupled for sale with "Root Zero-In" to allegedly work in tandem. The Root Website sells "Root Clean Slate and "Root Zero-In" as part of a "Root Smartship Pack" for $140.

335.    The Root Website claims, "**ROOT created** a proprietary mechanism to allow clinoptilolite to remove these toxins from your environment."

336.    The Root Website advertises, "CleanSlate is a solution of nanotized clinoptilolite fragments using a patent-pending proprietary process which cleans the cages and breaks apart the natural honeycomb cage structure of the clinoptilolite into much smaller fragments that are capable of permeating cellular membranes."

337.    Root Wellness also had/has a "ROOT Rewards Plan" and/or "Social Sharing Community" that offered monetary rewards for joining an "affiliate community."  The Root Website represented, "As an affiliate, simply share ROOT with your community and watch your

bank account grow.  When you help your community members grow, you can earn points, rewards, and bonuses based on the amount of ROOT products purchased throughout your entire global family."

338.    On or around January 16, 2020, Metron was in the process of negotiating and entering into a business relationship with ZOI Global related to the sale of Metron products.

339.    On January 16, 2020, Thomas had a phone conversation with Denise Stephens, CEO of ZOI Global.  The conversation was recorded.  On January 23, 2020, Cleveland Reporting Partners, LLC transcribed the conversation.

340.    Thomas deceptively identified himself as "Ray Owens" during the phone call.

341.    During that conversation, Thomas lied to Ms. Stephens about his identify for the sole purpose of interfering with Dr. Tsirikos-Karapanos and/or Metron's existing or potential business relationship with third-parties, specifically ZOI Global.

342.    Thomas attempted to dissuade ZOI Global from entering into any dealing with Metron by defaming Metron and Dr. Tsirikos-Karapanos and by spreading lies and falsehoods.

343.    On or around January 31, 2020, Thomas and/or Cook submitted urine samples to Access Medical Labs.  Access Medical Labs authored a final report on February 13, 2020.

344.    On February 2, 2020, Thomas authored a Facebook post using the phrase his "better half," in reference to Cook.

345.    On March 11, 2020, Thomas authored a Facebook post depicting the final report from Access Medical Labs with the caption:  "Your gluten free lifestyle is doing things you don't know.  Did you know rice loves to bind arsenic?  Rice flour in your snacks and supplements builds up in you.  Here is some data to show just that.  CleanSlate allows the simple removal.  10 drops twice daily a week apart."

346.    On March 11, 2020, Thomas authored a Facebook post claiming CleanSlate could result in "430% increase in mercury excretion in 7 days.  10 drops twice daily.  No negative side effects."

347.    On March 13, 2020, Clayton Thomas authored a Facebook post displaying pictures that Thomas claimed were "some scanning electron microscope images of zeolite fragments found in CleanSlate."

348.    On March 13, 2020, Thomas authored a Facebook post displaying photos that Thomas claimed showed "blood analysis of a 38 year old smoke pre and 10 minute later after 10 drops" of CleanSlate.  The Facebook post stated with the rhetorical questions:  "How does CleanSlate affect your body?  How quickly does it start working?"

349.    On May 8, 2020, Root Wellness, LLC registered with the Tennessee Secretary of State identifying 116 Wilson Pike Cir., Ste 100, Brentwood, TN 37027 as the "Principal Office" and "Mailing Address."

350.    On May 8, 2020, Clayton Thomas was a guest on Dove and Dragon Radio with host M.L. Ruscsak ("Dove Radio Spot").

351.    In the Dove Radio Spot, Thomas agreed when the host asked if Cook was his "wife."

352.    In the Dove Radio Spot, Thomas represented Cook had a "EdD" a "PsyD" and a "PhD."

353.    In the Dove Radio Spot, Thomas promoted the website vitatlityhappens.com and the Vitality Drops.

354.    In the Dove Radio Spot, Thomas promoted the "Cure the Cause" website curethecauses.com.

355.    On July 28, 2020, Cook posted a video on the internet, in which Cook said she was a "nanotechnologist." ("July 28th Video").

356.    In the July 28th Video, Cook said that, in the past, she was "looking at water soluble detox products."  Cook stated, "I even submitted a patent around that, but I didn't defend the patent because I ended up going back to school in nanotechnology, bioscience engineering, and I decided to change the way I magged zeolites."

357.    In the July 28th Video, Cook said, "I did not think the water-soluble formulas were good.  I did not want to work on those, so I started working more on silver ions and silicas."

358.    In the July 28th Video, Cook denied developing any formula for "water soluble zeolite."

359.    Clinoptilolite is a zeolite.

360.    In the July 28th Video, Cook stated:

"I know that there's a lot of things going on in the nutraceutical industry, and there's a lot of formulas out there and everyone keeps asking me which ones are mind.  And just so you guys know, if it says water soluble zeolite, that's not my formula.  I've worked on things that use fractionization, and I focus a lot on silicas now and silver ions."

361.    As recently as June 8, 2020, Clayton Thomas uploaded a video entitled "How to Use Clean Slate" promoting the allegedly water-soluble zeolite product, which was a "knock of" of Metron's product(s) and purportedly based upon Metron's Trade Secrets.

362.    On June 20, 2020, Thomas stated in a video posted online that "ROOT loves Hungary" and talked about his desire to expand the ROOT brand, including sales of CleanSlate to Hungary, Croatia, and Ukraine.

363.    Thomas has made statements to the public about his ability to reach millions of viewers through his internet postings, interviews, and publications, many of which promote Vitality and or CleanSlate.

364.    CleanSlate is still for sale.

365.    Defendants have profited from and continue to profit from the sale of CleanSlate.

366.    Defendants continued sale and promotion of Vitality, CleanSlate, and any other products based upon—or reportedly based upon—Metron's Trade Secrets is producing and will continue to produce great and irreparable injury to Metron.

367.    Defendants participate in the manufacture, marketing, promotion, sale, and distribution of CleanSlate.

368.    Cook, individually and/or by and through her companies—has used Metron's Trade Secrets to attempt to acquire intellectual property.

369.    Cook's pursuit of intellectual property individually and/or by and through her various companies  has caused further injury to Metron.

370.    Adams's pursuit of intellectual property individually and/or by and through his various companies has caused further injury to Metron.

371.    Thomas refers to Cook and talks about Cook's alleged knowledge and education when promoting Vitality and CleanSlate.

372.    Cook; Dr. Christina Rahm, LLC; and/or Dr Christina Rahm Ventures Incorporated is/are the licensor(s) of certain products to Root Wellness, LLC.

373.    Cook; Dr. Christina Rahm, LLC; and/or Dr Christina Rahm Ventures Incorporated is/are the licensor(s) of  certain products to Simply Wholeistic, Inc.

374.    Cook; Dr. Christina Rahm, LLC; and/or Dr Christina Rahm Ventures Incorporated is/are the licensor(s) of CleanSlate.

375.    Cook; Dr. Christina Rahm, LLC; and/or Dr Christina Rahm Ventures Incorporated is/are the licensor(s) of Vitality.

376.    Christina Rahm, LLC receives and/or has received royalties and/or sales revenues from Simply Wholeistic, Inc.

377.    Dr Christina Rahm Ventures Incorporated receives and/or has received royalties and/or sales revenues from Simply Wholeistic, Inc.

378.    Cure the Causes, Inc. receives and/or has received royalties and/or sales revenues from Simply Wholeistic, Inc.

379.    Christina Rahm, LLC receives and/or has received royalties and/or sales revenues from Root Wellness, LLC.

380.    Dr Christina Rahm Ventures Incorporated receives and/or has received royalties and/or sales revenues from Root Wellness, LLC.

381.    Cure the Causes, Inc.  receives and/or has received royalties and/or sales revenues from Root Wellness, LLC.

382.    Christina Rahm, LLC receives and/or has received, income, accounts receivable, royalties, and/or revenue from the sale, licensing, and/or distribution of CleanSlate.

383.    Christina Rahm, LLC receives and/or has received, income, accounts receivable, royalties, and/or revenue from the sale, licensing, and/or distribution of Vitality.

384.    Dr Christina Rahm Ventures Incorporated receives and/or has received, income, accounts receivable, royalties, and/or revenue from the sale, licensing, and/or distribution of CleanSlate.

385. Dr Christina Rahm Ventures Incorporated receives and/or has received, income, accounts receivable, royalties, and/or revenue from the sale, licensing, and/or distribution of Vitality.

386. Defendants have received, income, accounts receivable, royalties, and/or revenue from the sale, licensing, and/or distribution of Vitality.

387. Defendants have received, income, accounts receivable, royalties, and/or revenue from the sale, licensing, and/or distribution of CleanSlate.

388. Cure the Causes, Inc. receives and/or has received, income, accounts receivable, royalties, and/or revenue from the sale, licensing, and/or distribution of CleanSlate.

389. Cure the Causes, Inc. receives and/or has received, income, accounts receivable, royalties, and/or revenue from the sale, licensing, and/or distribution of Vitality.

390. Adams individually and/or by and through his companies receives and/or has received, income, accounts receivable, royalties, and/or revenue from the sale, licensing, and/or distribution of CleanSlate and/or Vitality.

391. EnTox Solutions, LLC receives and/or has received, income, accounts receivable, royalties, and/or revenue from the sale, licensing, and/or distribution of CleanSlate and/or Vitality.

392. TOP Partners Management, LLC receives and/or has received, income, accounts receivable, royalties, and/or revenue from the sale, licensing, and/or distribution of CleanSlate.

393. The Rahm Website contains a "Disclosure," which is a .pdf downloadable from the Rahm Website (the "Disclosure").

394. The Disclosure denies that Cook is currently involved in the "distribution and/or sales of nutraceuticals or supplement products."

395.    The Disclosure states: "We are not presently engaged in the distribution and/or sales of nutraceuticals or supplement products."

396.    The Rahm Website contains a banner stating, "**Coming soon Dr. Rahm's new line of natural products**!" containing two fields for people to type their name and email address to receive updates.[10]



397.    The Disclosure also states:   "The company makes no promises or claims concerning products produced."  The phrase "the company"—as used in the Disclosure—refers to Dr. Christina Rahm, LLC and/or Dr Christina Rahm Ventures Incorporated.  The phrase "products"—as used in the Disclosure—refers to Vitality and/or CleanSlate.

398.    The Disclosure also states: "Dr. Christina Rahm does not stand behind any of the past cold press seed-based products the brand represented in the past nor does it endorse license, or sale [sic] any water solution of water-soluble zeolite clinoptilolite fragments, water-soluble zeolite products, or any products that have "hydrolyzed clinoptilolite fragments."

399.    The Disclosure states that Cook has "in the past, filed provisional patents in one or more of these areas" but "**decided against defending the patents** because she was not completely confident in the efficacy of the technology…"

400.    The "numerous products" used in the above-quoted section of the Disclosure includes CleanSlate and Vitality.

---

[10] https://drchristinarahm.com/wisdom/

401.    The Disclosure does not disclose that Cook assigned intellectual property rights to Adams and/or EnTox Solutions, LLC.

402.    The Disclosure does not disclose that any decision relating to "defending the patents" that Cook purportedly owns, was assigned to Adams and/or EnTox Solutions, LLC.

403.    The Disclosure claims that Cook "has developed numerous products that use innovative forms of bioscience engineering, biochemical engineering, and nanotechnology that she gained from the last three years of education."

404.    The Disclosure also states:

"…Dr. Rahm is aware that certain individuals have attempted to discredit her credentials and training by publicizing patently false information….Dr. Cook's expertise and developments continue to be attacked by said companies in the context of **frivolous legal pleadings** they have filed and appear to be solely for the purpose of attempting to gain a legal advantage through **their continued harassment and slander**…"

405.    The term "frivolous legal pleadings" as used in the above quoted portion of the Disclosure is in reference to Metron's filings in this lawsuit, including the original Complaint.

406.    The term "said companies" as used in the above quoted portion of the Disclosure includes Metron.

## COUNT I
## MISAPPROPRIATION AND IMPROPER MEANS
## OHIO UNIFORM TRADE SECRET ACT
### (All Defendants)

407.    Metron incorporates by reference Paragraphs 1 through 406 of this Complaint as if fully set forth herein.

408.    Metron's Trade Secrets are not available to Metron's competitors and Metron's water-soluble zeolite product(s) are patented and fully protected by two U.S. Patents.  This information constitutes a trade secret under Ohio law because (a) it derives independent

economic value, actual or potential, from not being generally known to other persons who could otherwise obtain economic value from its disclosure or use and (b) it is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

409.    Thomas was aware of the confidential and proprietary nature of Metron's Trade Secrets.

410.    Cook was aware of the confidential and proprietary nature of Metron's Trade Secrets.

411.    Adams was aware of the confidential and proprietary nature of Metron's Trade Secrets.

412.    Defendants directly and/or through the actions of its agents, including Cook, Thomas, and/or Adams willfully, wrongfully, and maliciously misappropriated Metron's Trade Secrets in violation of law by removing confidential information from Metron's offices, disclosing Metron's Trade Secrets to third-parties, publishing Metron's Trade Secrets, and/or using Metron's Trade Secrets to compete with and/or harm Metron.

413.    As set forth herein, Defendants acquired Metron's Trade Secrets through improper means by using deceit, misrepresentations, and breaching duties owed to Metron to maintain secrecy.

414.    The execution of Cook's MCA, Thomas's MCA, and Adams's MCA demonstrates Metron's desire to keep information and trade secrets related to Metron's production of nutraceutical products a secret from Metron's competitors.

415.    Defendants violated Ohio's Uniform Trade Secret Act as described herein and are liable to Metron for misappropriation.

416.    Defendants' misappropriation was willful and malicious, as evidenced by public statements, prior interactions with Metron, and specific knowledge of Metron's Trade Secrets and Metron's desire to keep them confidential.

417.    Defendants acquired Metron's trade secrets by improper means by learning of Metron's trade secrets under the guise of seeking to engage in a business relationship with Metron—despite Defendants having no intention of entering into a business relationship with Metron.

418.    Metron's Trade Secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use."

419.    Metron made reasonable efforts, including sending correspondence to Defendants regarding injunctive relief against Thomas, acquiring patents, obtaining intellectual property, and requiring Thomas and Cook to sign Confidentiality Agreements, to protect information that Metron considers trade secrets.

420.    Metron seeks all damages available under the Ohio Uniform Trade Secrets Act, including but not limited to actual loss caused by misappropriation and/or the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss.

421.    Metron also seeks, concurrently and/or in the alternative, a reasonable royalty that is equitable under the circumstances.

422.    Metron seeks exemplary and punitive damages pursuant to O.R.C. § 1333.63(B).

423.    Defendants misappropriation was made in bad faith.   Defendants were aware the misappropriated information were confidential in nature and constituted trade secrets. Defendants purposes, and with the intent to harm Metron, used Metron's Trade Secrets for their

own financial gain and to the detriment of Metron.  Defendants knew that the manufacture, marketing, sale, and distribution of CleanSlate and Vitality were unlawful and constituted a misappropriation, as evidenced by Thomas's public statements, and statements regarding CleanSlate, Vitality, and/or Metron contained on the Defendants' various websites.

424.    Defendants—and in particular Thomas, Cook, and Adams—were aware they lacked the technical and scientific knowledge, training, education, or skill to invent, develop, or manufacture a product containing water-soluble clinoptilolite fragments without misappropriating Metron's Trade Secrets.

425.    Metron is entitled to reasonable attorney's fees for pursing this lawsuit pursuant to O.R.C. § 1333.64 because Defendants' misappropriation was willful, malicious, and made in bad faith—as described herein.

426.    Concurrently and/or in the alternative, Metron is entitled to disgorgement of Defendants' profits from the manufacture, marketing, sale, or distribution of Vitality; CleanSlate; any sales packages that includes Vitality or Clean Slate; any products containing water-soluble clinoptilolite fragments; and/or any product that, in any way, utilizes, references, is marketed or depends upon Metron's Trade Secrets.

427.    Concurrently and/or in the alternative, Metron is entitled to recovery from Defendants of all costs and expenses, including reasonable attorneys' fees, related to defending Metron's intellectual property and/or necessitated by Defendants' pursuit of Cook's Patent Applications

428.    Concurrently and/or in the alternative, Metron is entitled disgorge of compensation and consideration Cook from Adams and/or EnTox Solutions, LLC in exchange for the Contribution Agreement and Assignment.

429.    Concurrently and/or in the alternative, Metron is entitled to disgorgement of Defendants' profits that, in any way, relate to Metron's Trade Secrets.

430.    Concurrently and/or in the alternative, Metron is entitled compensatory damages for loss of Metron's reasonable expectation of profits, sales, and income under the Sozo EDA.

**COUNT II**
**MANDATORY INJUNCTION**
**(All Defendants)**

431.    Metron incorporates by reference Paragraphs 1 through 430 of this Complaint as if fully set forth herein.

432.    To prevent future irreparable harm to Metron, Metron seeks a mandatory injunction pursuant to O.R.C. § 1333.62 enjoining Defendants—collectively or individually—from continuing to manufacture, market, promote, sale, or distribute Vitality, CleanSlate, or any other product containing or referencing water-soluble clinoptilolite fragments.

433.    Metron seeks a mandatory injunction pursuant to O.R.C. § 1333.62 enjoining Defendants—collectively or individually—from continuing to represent, infer, or imply that Defendants' own intellectual property rights related to any product containing water-soluble clinoptilolite fragments.

434.    Metron seeks a mandatory injunction pursuant to O.R.C. § 1333.62(C) ordering Defendants—collectively or individually—to recall all products manufactured, marketed, sold, or distributed by one or more Defendants that contain or purport to contain water-soluble clinoptilolite fragments.

435.    Metron seeks a mandatory injunction pursuant to O.R.C. § 1333.62(C) ordering Defendants—collectively or individually—to recall all Vitalty and CleanSlate products from the market.

436.     Metron seeks a mandatory injunction pursuant to O.R.C. § 1333.62(C) ordering Defendants—collectively or individually—to eliminate all websites, Facebook pages, YouTube channels, Instagram accounts, or any other media platform maintained and/or created by one or more Defendants that, in any way, contain information related to "Root Product," "Vitality," "Clean Slate," and/or any other product containing or purporting to contain water-soluble clinoptilolite fragments.

437.     To the extent any Defendants have acquired intellectual property, in the form of patents or any other intellectual property, based upon misappropriating Metron's Trade Secrets, Metron is entitled to an assignment of all such intellectual property, and Metron requests that this Court assign all such intellectual property, to the extent it exists, to Dr. Tsirikos-Karapanos.

438.     The Defendants' continued misappropriation of Metron's Trade Secrets will cause irreparable harm to Metron if this Court does not enjoin Defendants from continuing to manufacture, promote, advertise, market, sell, or distribute "knock off" products based upon Metron's Trade Secrets.

## COUNT III
### BREACH OF CONTRACT / INJUNCTIVE RELIEF
### (Thomas, Cook, Adams, and EnTox Solutions, LLC)

439.     Metron incorporates by reference Paragraphs 1 through 406 of this Complaint as if fully set forth herein.

440.     As described herein, Cook breached her MCA with Metron by failing to maintain confidential information that was subject to the MCA; using Metron's confidential information to her benefit without Metron's permission or knowledge; failing to return confidential information that was subject to the MCA; and improperly disclosing confidential information that was subject to the MCA.

441.   Metron did not breach the Cook MCA.

442.   As described herein, Thomas breached his MCA with Metron by failing to maintain confidential information that was subject to the MCA; using Metron's confidential information to his benefit without Metron's permission or knowledge; failing to return confidential information that was subject to the MCA; and improperly disclosing confidential information that was subject to the MCA.

443.   Metron did not breach the Thomas MCA.

444.   As described herein, Adams breached his MCA with Metron by failing to maintain confidential information that was subject to the MCA; using Metron's confidential information to his benefit without Metron's permission or knowledge; failing to return confidential information that was subject to the MCA; and improperly disclosing confidential information that was subject to the MCA.

445.   As described herein, and concurrently and/or in the alternative, EnTox Solutions, LLC breached the Adams MCA with Metron by failing to maintain confidential information that was subject to the MCA; using Metron's confidential information to his benefit without Metron's permission or knowledge; failing to return confidential information that was subject to the MCA; and improperly disclosing confidential information that was subject to the MCA.

446.   Metron did not breach the Adams MCA.

447.   As a direct and proximate result of these contractual breaches, Metron suffered actual monetary loss in the form of lost revenue, legal costs, expenses, lost opportunities, and diminution in goodwill.

448.   Under the Cook MCA, Cook agreed that "remedies at law will be inadequate to protect against actual and threatened breach of this Agreement; and each party agrees in advance

to the granting of injunctive relief in favor of the other without proof of actual damages in addition to any rights and remedies available to it."

449.    Under the Thomas MCA, Thomas agreed that "remedies at law will be inadequate to protect against actual and threatened breach of this Agreement; and each party agrees in advance to the granting of injunctive relief in favor of the other without proof of actual damages in addition to any rights and remedies available to it."

450.    Under the Adams MCA, Adams and/or EnTox Solutions, LLC agreed that "remedies at law will be inadequate to protect against actual and threatened breach of this Agreement; and each party agrees in advance to the granting of injunctive relief in favor of the other without proof of actual damages in addition to any rights and remedies available to it."

451.    Pursuant to the Cook MCA, Metron seeks injunctive relief enjoining Cook—individually or through any of her companies or companies to which Cook is affiliated in any way—from continuing to manufacture, market, promote, sale, or distribute Vitality, CleanSlate, or any other product containing water-soluble clinoptilolite fragments.

452.    Pursuant to the Cook MCA, Metron seeks injunctive relief enjoining Cook—individually or through any of her companies or companies to which Cook is affiliated in any way—from continuing to represent, infer, or imply that Defendants' own intellectual property rights related to any product containing water-soluble clinoptilolite fragments.

453.    Pursuant to Cook's MCA, Metron seeks injunctive relief ordering Cook—individually or through any of her companies or companies to which Cook is affiliated in any way—to recall all products manufactured, marketed, sold, or distributed by one or more Defendants that contain or purport to contain water-soluble clinoptilolite fragments.

454.    Pursuant to the Cook MCA, Metron seeks injunctive relief ordering Cook—individually or through any of her companies or companies to which Cook is affiliated in any way—to recall all "Vitalty" and "Clean Slate" and/or "Root Clean Slate" products from the market.

455.    Pursuant to the Cook MCA, Metron seeks injunctive relief ordering Cook—individually or through any of her companies or companies to which Cook is affiliated in any way—to eliminate all websites, Facebook pages, YouTube channels, Instagram accounts, or any other media platform maintained and/or created by one or more Defendants that, in any way, contain information related to "Root Product," "Vitality," "Clean Slate," "Root Clean Slate" and/or any other product containing or purporting to contain water-soluble clinoptilolite fragments.

456.    Pursuant to the Thomas MCA, Metron seeks injunctive relief enjoining Thomas—individually or through any of his companies or companies to which Thomas is affiliated in any way—from continuing to manufacture, market, promote, sale, or distribute "Vitality", "Clean Slate", "Root Clean Slate" or any other product containing  or purporting to contain water-soluble clinoptilolite fragments.

457.    Pursuant to the Thomas MCA, Metron seeks injunctive relief enjoining Thomas—individually or through any of his companies or companies to which Thomas is affiliated in any way—from continuing to represent, infer, or imply that Defendants' own intellectual property rights related to any product containing or purporting to contain water-soluble clinoptilolite fragments.

458.    Pursuant to the Thomas MCA, Metron seeks injunctive relief ordering Thomas—individually or through any of his companies or companies to which Thomas is affiliated in any

way—to recall all products manufactured, marketed, sold, or distributed by one or more Defendants that contain or purport to contain water-soluble clinoptilolite fragments.

459.    Pursuant to the Thomas MCA, Metron seeks injunctive relief ordering Thomas— individually or through any of his companies or companies to which Thomas is affiliated in any way—to recall all "Vitalty", "Root Clean Slate" and/or "Clean Slate" products from the market.

460.    Pursuant to the Thomas MCA, Metron seeks injunctive relief ordering Thomas— individually or through any of his companies or companies to which Thomas is affiliated in any way—to eliminate all websites, Facebook pages, YouTube channels, Instagram accounts, or any other media platform maintained and/or created by one or more Defendants that, in any way, contain information related to "Root Product," "Root Clean Slate," "Vitality," "Clean Slate," and/or any other product containing or purporting to contain or purport to contain water-soluble clinoptilolite fragments.

461.    Pursuant to the Adams MCA, Metron seeks injunctive relief enjoining Adams— individually or through any of his companies or companies to which Adams is affiliated in any way—from continuing to manufacture, market, promote, sale, or distribute "Vitality", "Root Clean Slate", "Clean Slate", or any other product containing  or purporting to contain water-soluble clinoptilolite fragments.

462.    Pursuant to the Adams MCA, Metron seeks injunctive relief enjoining Adams— individually or through any of his companies or companies to which Adams is affiliated in any way—from continuing to represent, infer, or imply that Defendants' own intellectual property rights related to any product containing or purporting to contain water-soluble clinoptilolite fragments.

463.    Pursuant to the Adams MCA, Metron seeks injunctive relief ordering Adams—individually or through any of his companies or companies to which Adams is affiliated in any way—to eliminate all websites, Facebook pages, YouTube channels, Instagram accounts, or any other media platform maintained and/or created by one or more Defendants that, in any way, contain information related to "Root Product," "Root Clean Slate," "Vitality," "Clean Slate," and/or any other product containing or purporting to contain or purport to contain water-soluble clinoptilolite fragments.

464.    Pursuant to the Adams MCA, Metron seeks an injunction transferring any intellectual property rights owned by Adams; EnTox Solutions, LLC; and/or TOP Partners Management, LLC to Metron as described or identified in the Contribution Agreement or Assignment.

465.    Concurrently and/or in the alternative, Metron is entitled to disgorgement of Defendants' profits from the manufacture, marketing, sale, or distribution of "Vitality"; "Root Clean Slate"; CleanSlate; any sales package that includes "Vitality"; "Root Clean Slate" or "Clean Slate"; any product containing or purports to contain water-soluble clinoptilolite fragments; and any product that, in any way, utilizes, references, or depends upon Metron's Trade Secrets.

466.    Concurrently and/or in the alternative, Metron is entitled to disgorgement of Defendants' profits that, in any way, related to Metron's Trade Secrets.

467.    Concurrently and/or in the alternative, Metron is entitled compensatory damages for loss of Metron's reasonable expectation of profits, sales, and income under the Sozo EDA.

## COUNT IV
## TORTIOUS INTERFERENCE
### (Thomas, Cook, and Adams)

468.    Metron incorporates by reference Paragraphs 1 through 406 of this Complaint as if fully set forth herein.

469.    Thomas, Cook, and Adams—individually and/or collectively and/or through their various companies—intentionally and improperly interfered with Metron's contractual relations with other entities by inducing or otherwise causing a third person not to enter into or continue the prospective relation, or preventing Metron from acquiring or continuing the prospective relation.

470.    Thomas, Cook, and Adams were aware business relationship existed between Metron and other entities and/or individuals.

471.    Thomas and Cook engaged in conduct in intended to harm, prevent, frustrate, and/or delay Metron's business relationship by engaging in the following conduct:

      a.    Publicly defaming and spreading false information about Metron.

      b.    Publicly defaming and spreading false information about Dr. Tsirikos-Karapanos.

      c.    Contacting individuals with whom Metron had business dealings and/or was pursing business dealings.

      d.    Misrepresenting the nature, efficacy, and safety of Metron's products.

      e.    Misrepresenting the existence of Defendants' intellectual property.

      f.    Dissuading individuals and entities from representing or working with Metron.

g.      Dissuading, preventing, and/or other causing Sozo from fulfilling its obligations to Metron under the Sozo EDA.

h.      Entering into business transactions with other entities that should have and would have been Metron's business transactions but for Thomas and Cook's tortious interference.

472.    Adams engaged in conduct in intended to harm, prevent, frustrate, and/or delay Metron's business relationship by engaging in the following conduct:

a.      Conspiring with Cook to create a "knock off" of Metron's product(s).

b.      Investing in, financially supporting, and acquiring intellectual property rights adverse to Metron.

c.      Intentionally misleading Metron by obtaining from Metron information about Metron's products, inventions, practices, and technologies under the guise of wanting to engage in business with Metron.

d.      Misrepresenting to Metron that he was not cooperating with Thomas or Cook.

e.      Publicly defaming and spreading false information about Metron.

f.      Publicly defaming and spreading false information about Dr. Tsirikos-Karapanos.

g.      Contacting individuals with whom Metron had business dealings and/or was pursing business dealings.

h.      Misrepresenting the nature, efficacy, and safety of Metron's products.

i.      Misrepresenting the existence of Defendants' intellectual property.

        j.      Dissuading individuals and entities from representing or working with Metron.

        k.      Dissuading, preventing, and/or other causing Sozo from fulfilling its obligations to Metron under the Sozo EDA.

        l.      Entering into business transactions with other entities that should have and would have been Metron's business transactions but for Thomas and Cook's tortious interference.

473.    Metron suffered damages as a direct and proximate result of Thomas, Cook, and Adams's tortious interference, including but not limited to consulting with attorneys, hiring court reporters to transcribe the tortious interference, experiencing a delay in entering into contractual relationship with other entities resulting in lost profits, and losing out on business opportunities.

474.    Metron is entitled to an award of compensatory damages in an amount in excess of $25,000 to be determined at trial.

475.    Thomas and Cook's actions were wanton, willful, malicious, and done with conscious disregard of Metron's rights, and Metron is entitled to punitive damages, including reasonable attorneys' fees.

476.    Concurrently and/or in the alternative, Metron is entitled compensatory damages for loss of Metron's reasonable expectation of profits, sales, and income under the Sozo EDA.

## COUNT V
## FRAUDULENT MISREPRESENTATION
## (Adams)

477.     Metron incorporates by reference Paragraphs 1 through 406 of this Complaint.

478.     As described herein, Adams intentionally, maliciously, and recklessly defrauded Metron and knowingly made numerous misrepresentations to Metron with the intent to harm Metron, including:

    a.     Denying cooperating with Cook.

    b.     Denying having a contractual relationship with Cook

    c.     Denying correspondence with Cook and/or Thomas.

    d.     Misrepresenting Failing to disclose Adams's execution of the Assignment.

    e.     Failing to disclose Adams's execution of the Contribution Agreement with Cook.

    f.     Failing to disclose his interest in EnTox Solutions, LLC.

    g.     Assuring Metron that Adams and Metron were aligned with Metron *against* Cook and Thomas, despite Adams's secret dealings with Cook, Thomas, and their various companies.

    h.     Metron only recently discovered Adams's fraud and misrepresentations, including Adams' secret dealings with one or more Defendants, including Cook.

479.     Metron relied upon Adams' misrepresentations to Metron's detriment as described herein.

480.     Metron is entitled to compensatory damages as a result of Adams's fraud and misrepresentations.

481.    Metron is entitled to punitive damages, including reasonable attorneys' fees as a result of Adams's fraud and misrepresentations.

482.    Concurrently and/or in the alternative, Metron is entitled compensatory damages for loss of Metron's reasonable expectation of profits, sales, and income under the Sozo EDA.

### COUNT VI
### PIERCING THE CORPORATE VEIL / INDIVIDUAL LIABILITY
### (Cook, Thomas, and Adams)

483.    Metron incorporates by reference Paragraph 1 through 482 of this Complaint.

484.    Cook's control over Dr. Christina Rahm, LLC; Dr Christina Rahm Ventures Incorporated; Cure the Causes, Inc.; Merci Dupre LLC; DC2 Holdings, LLC; and DC2 Healthcare LLC is so complete that the companies have no separate mind, will, or existence of their own.

485.    Cook's control over Dr. Christina Rahm, LLC; Dr Christina Rahm Ventures Incorporated; Cure the Causes, Inc.; Merci Dupre LLC; DC2 Holdings, LLC; and DC2 Healthcare LLC;  was exercised and is being exercised in such a manner as to commit fraud or an illegal act against Metron.

486.    Metron has suffered an injury or unjust loss as a result of Cook's control over Dr. Christina Rahm, LLC; Dr Christina Rahm Ventures Incorporated; Cure the Causes, Inc.; Merci Dupre LLC; DC2 Holdings, LLC; and DC2 Healthcare LLC and wrongdoing as described herein

487.    Dr. Christina Rahm, LLC; Dr Christina Rahm Ventures Incorporated; Cure the Causes, Inc.; Merci Dupre LLC; DC2 Holdings, LLC; and DC2 Healthcare LLC are mere alter egos of Cook.

488.    As such, Cook is individually liable to Metron for causes of actions asserted against Dr. Christina Rahm, LLC; Dr Christina Rahm Ventures Incorporated; Cure the Causes, Inc.; Merci Dupre LLC; DC2 Holdings, LLC; and DC2 Healthcare LLC as alleged herein.

489.    Thomas's control over Simply Wholeistic, Inc. and Root Wellness, LLC is so complete that the companies have no separate mind, will, or existence of their own.

490.    Thomas's control over Simply Wholeistic, Inc. and Root Wellness, LLC was exercised and is being exercised in such a manner as to commit fraud or an illegal act against Metron.

491.    Metron has suffered an injury or unjust loss as a result of Thomas's control over Simply Wholeistic, Inc. and Root Wellness and wrongdoing as described herein.

492.    Simply Wholeistic, Inc. and Root Wellness, LLC are mere alter egos of Thomas.

493.    As such, Thomas is individually liable to Metron for causes of actions asserted against Simply Wholeistic, Inc. and Root Wellness, LLC as alleged herein.

494.    Adams's control over EnTox Solutions, LLC and TOP Partners Management, LLC is so complete that the companies have no separate mind, will, or existence of their own.

495.    Adams's control over EnTox Solutions, LLC and TOP Partners Management, LLC was exercised and is being exercised in such a manner as to commit fraud or an illegal act against Metron.

496.    Metron has suffered an injury or unjust loss as a result of Adams's control over EnTox Solutions, LLC and TOP Partners Management, LLC and wrongdoing as described herein.

497.    EnTox Solutions, LLC and TOP Partners Management, LLC are mere alter egos of Adams.

498.     As such, Adams is individually liable to Metron for causes of actions asserted against EnTox Solutions, LLC and TOP Partners Management, LLC as alleged herein.

**COUNT VII**
**PRELIMINARY INJUNCTION**
**(All Defendants)**

499.     Metron incorporates by reference Paragraphs 1 through 499 of this Complaint.

500.     Pursuant to O.R.C. § 2727.02 and Rule 65 of the Federal Rules of Civil Procedure, Metron requests and asserts it is entitled to a preliminary injunction and temporary order prohibiting Defendants from engaging in the following conduct during the course of this litigation:

a.     Selling, promoting, or distributing "Vitality", "Vitality Drops", "Vitality Detox Drops" or any other product containing or purporting to contain water soluble zeolite or water soluble clinoptilolite or water soluble clinoptilolite fragments.

b.     Selling, promoting, or distributing "CleanSlate" or "Root CleanSlate" or "Clean Slate" or "Roots Clean Slate" or any other product containing or purporting to contain water soluble zeolite or water soluble clinoptilolite or water soluble clinoptilolite fragments.

c.     Making any public statements—aside from statements related this litigation—disparaging Metron or Dr. Nikolaos Tsirikos-Karapanos.

d.     Publishing any articles or videos that mention—or in any way relate to—water soluble zeolite or water soluble clinoptilolite or water soluble clinoptilolite fragments.

e.     Publishing any articles or videos that mention—or in any way relate to—"ROOT" or "ROOT Brands."

f.     Publishing any articles or videos that mention—or in any way relate to—"Vitality" or "Vitality Drops" or "Vitality Detox Drops".

g.      Publishing any articles or videos that mention—or in any way relate to—CleanSlate or any product package containing "CleanSlate" or "Root CleanSlate" or "Clean Slate" or Root Clean Slate".

h.      Continued use of Metron's Trade Secrets to promote any product or service.

501.   Commission of the above-listed acts, which Defendants is currently doing and will continue to do during the course of this litigation, will produce great and irreparable injury to Metron.

502.   Commission of the above-listed acts, which Defendants is currently doing and will continue to do during the course of this litigation, will violate Merton's rights and Trade Secrets, which will tend to render any subsequent judgment in this lawsuit ineffectual.

503.   Since Metron served upon Cook Metron's original Complaint in this lawsuit, Cook has formulated two new entities in an attempt to shield assets and avoid Metron collecting compensatory damages at the resolution of this lawsuit.

504.   Metron will likely succeed on the merits on its causes of action alleged in this Complaint, as described herein.

505.   Defendants cannot in good faith dispute that Cook, Thomas and Adams had access to Metron's Trade Secrets and knew of Metron's desire to keep such information confidential.

506.   Defendants have used and continue to use Metron's Trade Secrets to promote themselves, their companies, and their products to the detriment of Metron.

507.   Without access to Metron's Trade Secrets, including Metron's manufacturing of water soluble clinoptilolite fragments, Defendants would not have been able to formulate—or

71

purport to formulate—any products containing or allegedly containing water soluble clinoptilolite fragments, including "Vitality" or "Vitality Drops" or "Vitality Detox Drops" and "CleanSlate" or "Clean Slate" or "Root Clean Slate" or Root CleanSlate".

508.     Defendants own statements claim that both Vitality and CleanSlate contain water soluble clinoptilolite fragments.

509.     Metron will suffer irreparable harm unless preliminary injunctive relief is granted.

510.     Defendants plan to sell Vitality and CleanSlate—and potentially other products claiming to contain water soluble clinoptilolite fragments—worldwide and have developed a multi-level marketing company to distribute Vitality and CleanSlate.

511.     Defendants post content, including articles, videos, Facebook posts, promoting Vitality and CleanSlate attempting to occupy the water-soluble clinoptilolite fragment market.

512.     Once the nutraceutical market is saturated with Vitality and CleanSlate it will cause irreparable harm to Metron and Metron's ability to market, sell, and distribute its own products containing water soluble clinoptilolite fragments.

513.     Defendants fraudulent misrepresentations about Vitality and CleanSlate will make it more difficult—if not impossible—for Metron or any other company with which Metron contracts to market, sell, and/or distribute a water soluble zeolite containing products.

514.     Defendants' misappropriation of Metron's Trade Secrets, breaches of contract, and other tortious conduct alleged herein, will greatly harm Metron—likely in an irreparable way.

515.     Compensatory damages awarded to Metron at the conclusion of this lawsuit will be insufficient to remedy undue the harm that Defendants will impose upon Metron during the pendency of this lawsuit.

516.    No other third-parties will suffer injury from the granting a preliminary injunction.

517.    Public interest will able be service by granting this preliminary injunction.

518.    Metron requests a hearing pursuant to Rule 65 of Federal Rules of Civil Procedure.

**WHEREFORE** Metron requests a judgment to entered in its favor as set forth herein and against Defendants.

Respectfully Submitted,

*/s/ Daniel A. Leister*
Ryan K. Rubin (0077367)
Daniel A. Leister (0089612)
LEWIS BRISBOIS BISGAARD & SMITH LLP
1375 E. 9th Street, Suite 2250
Cleveland, Ohio 44114
Tel. 216.344.9422
Fax 216.344.9421
Ryan.Rubin@lewisbrisbois.com
Dan.Leister@lewisbrisbois.com
*Counsel for Metron Nutraceuticals, LLC*

## JURY DEMAND

Metron Nutraceuticals, LLC demands a trial by jury on all triable factual issues pursuant to Ohio law and the Federal Rules of Civil Procedure.

*/s/ Daniel A. Leister*
Ryan K. Rubin (0077367)
Daniel A. Leister (0089612)
LEWIS BRISBOIS BISGAARD & SMITH LLP
*Counsel for Metron Nutraceuticals, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Amended Complaint has been electronically filed this 17th day of August, 2020 and all Defendants will be served by the Court.  A copy of the Amended Complaint has also been served by electronic mail and/or ordinary U.S. Mail upon the following:

Andrew S. Peterson, Esq.
Steven W. Albert, Esq.
The Albert Law Firm
29425 Chagrin Blvd., Suite 216
Pepper Pike, OH  44122
apeterson@salbertlaw.com
salbert@salbertlaw.com
*Attorneys for Defendant*
*Christina Rahm Cook*

Simply Wholeistic, Inc.
dba Root, Inc.
c/o Registered Agent
Kline Preston, Suite 107
4515 Harding Pike, Suite 107
Nashville, TN  37027

Root Wellness, LLC
116 Wilson Pike Circle, Suite 240
Brentwood, TN 37027

Clayton Thomas
1704 Championship Blvd.
Franklin, TN 37064

/s/ *Daniel A. Leister*
Ryan K. Rubin (0077367)
Daniel A. Leister (0089612)
LEWIS BRISBOIS BISGAARD & SMITH LLP
*Counsel for Metron Nutraceuticals, LLC*