# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

METRON NUTRACEUTICALS, LLC,

      Plaintiff and
      Counter-Claim Defendant,

v.

CHRISTINA RAHM COOK, *et al.*,

      Defendants and,
      as to Christina Rahm Cook,
      Counter-Claim Plaintiff.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 1:20-cv-01803

Judge J. Philip Calabrese

## OPINION AND ORDER

Plaintiff Metron Nutraceuticals, LLC alleges that Defendants, three individuals and ten corporations, misappropriated its trade secrets relating to certain dietary supplements and breached several of the parties' contracts. Defendants dispute those contentions, and Defendant Christina Rahm Cook counterclaims, bringing a claim for breach of contract and arguing, among other things, that Metron Nutraceuticals violated trade secrets law. All Defendants move for summary judgment on the claims against them, while Plaintiff seeks summary judgment on Ms. Cook's counterclaim. For the reasons that follow, the Court **GRANTS** Defendants' motion and **DENIES AS MOOT** Plaintiff's motion.

## STATEMENT OF FACTS

For the reasons explained below, the Court need only address the merits of Defendants' motion for summary judgment. Therefore, the Court construes the

record in the light most favorable to Plaintiff as the non-movant.  At this stage of the proceedings, it establishes the following facts.

### A.  Dr. Nikoloas Tsirikos-Karapanos

Metron Nutraceuticals is an Ohio company that researches, develops, and manufactures dietary supplements.  (ECF No. 156-1, PageID #4883.)  It has two owners and three employees.  (*Id.*, PageID #4851–56.)  A limited liability company owns 8%, and Dr. Nikolaos Tsirikos-Karapanos owns the other 92%.  (*Id.*, PageID #4851.)  Dr. Tsirikos-Karapanos serves as the president of Metron Nutraceuticals, overseeing its other employees:  (1) Chrys Palavra, who is his spouse and the company's chief operating officer, and (2) Rose Whitcomb, a lab technician. (*Id.*, PageID #4851 & #4853–55.)  Thus far, Metron Nutraceuticals has released at least three detoxification products.  (*Id.*, PageID #4883–84.)  Each contains water-soluble zeolite clinoptilolite fragments as an ingredient.  (*Id.*, PageID #4884–88.)

Dr. Tsirikos-Karapanos earned several degrees in Athens, Greece, including a doctor of pharmacy, doctor of medicine, and doctor of philosophy in mechanical circulatory support relating to cardiovascular surgery.  (*Id.*, PageID #4860–63.)  He is also a board-certified pharmacist in Europe and has practiced as a surgeon.  (*Id.*, PageID #4860–61 & #4863–65.)

### A.1.  LifeHealth Science, LLC

Before forming Metron Nutraceuticals, Dr. Tsirikos-Karapanos worked for LifeHealth Science, LLC.  (*Id.*, PageID #4873.)  Like Metron Nutraceuticals, LifeHealth Science is a dietary supplements company.  (*Id.*)  As its chief scientist and medical director, he worked to solve problems LifeHealth Science had in producing

clinoptilolite-based supplements.  (*Id.*, PageID #4873–75.)  At that time, LifeHealth Science had three or four products.  (*Id.*, PageID #4875.)  According to Dr. Tsirikos-Karapanos, none of the formulations for those products met the U.S. Food and Drug Administration's standards.  (*Id.*, PageID #4875–77.)  He told that to the LifeHealth Science owners.  (*Id.*)  Although LifeHealth Science asked him to sign a nondisclosure agreement, Dr. Tsirikos-Karapanos refused.  (*Id.*, PageID #5042.)

### A.2.    Formation of Metron Nutraceuticals

When bringing LifeHealth Science's formulations up to standard, Dr. Tsirikos-Karapanos had the idea to use water-soluble zeolite clinoptilolite fragments instead of water suspensions of clinoptilolite.  (*Id.*, PageID #4889–90 & #4958–59.)  In a suspension, gravity draws particles to the bottom of a container.  (*Id.*, PageID #4921.)  In a solution, however, particles remain suspended.  (*Id.*)  Dr. Tsirikos-Karapanos used LifeHealth Science's facilities and equipment to see if he could produce such a solution in his spare time.  (*Id.*, PageID #4890 & #5019.)  Around June 2014, he believed he had succeeded.  (*Id.*, PageID #5025.)  Later experimentation revealed that what he developed proved to be only a good suspension, not a solution.  (*Id.*, PageID #4890–91.)

Even though he had not, Dr. Tsirikos-Karapanos believed he had developed a process for creating hydrolyzed zeolite clinoptilolite fragments and pitched his idea to Bert Moyar, LifeHealth Science's owner.  (*Id.*, PageID #5025.)  Moyar was not interested in investing in or developing the ingredient; however, he wanted to sell it to a multi-level marketing company.  (*Id.*, PageID #5025–29.)  Defendant Clayton Thomas, who was then a salesperson for LifeHealth Science and worked on

3

commission, suggested a company called Jeunesse Global as another option.  (*Id.*, PageID #5026 & #5031.)

In August 2014, Moyar, Mr. Thomas, and Dr. Tsirikos-Karapanos met with representatives of Jeunesse Global.  (*Id.*, PageID #5030–31 & #5038.)  After Dr. Tsirikos-Karapanos' presentation, Jeunesse Global expressed interest in his idea.  (*Id.*, PageID #5032–33.)  However, it first demanded that the three men form a new entity because LifeHealth Science was in bankruptcy.  (*Id.*)  Initially, Moyar, Mr. Thomas, and Dr. Tsirikos-Karapanos agreed to create a new entity with each having an equal ownership interest.  (*Id.*, PageID #5033.)  That plan fell through, and Mr. Thomas and Dr. Tsirikos-Karapanos agreed to form their own entity—Metron Nutraceuticals.  (*Id.*, PageID #5034–35 & #5037.)

## B.  Metron Nutraceuticals' Patent Applications

Two months later, Dr. Tsirikos-Karapanos left LifeHealth Science.  (*See id.*, PageID #4874.)  On October 9, 2014, he formed Metron Nutraceuticals.  (ECF No. 154-2, PageID #3495; ECF No. 156-1, PageID #5038.)  Mr. Thomas—the company's chief marketing officer—and Dr. Tsirikos-Karapanos each held a 44.5% ownership interest.  (ECF No. 156-1, PageID #5040.)  Four other individuals and entities owned the remaining 11%.  (*Id.*, PageID #5039–40.)

While at Metron Nutraceuticals, Mr. Thomas executed multiple confidentiality agreements, including one dated October 24, 2014, that included covenants not to compete and a duty to protect confidential information.  (ECF No. 155-3, PageID #4679; ECF No. 157-5, PageID #6216–17.)

### B.1.    Applications and Publication

#### B.1.a. Patent Applications

On the same day as its formation, October 9, 2014, Metron Nutraceuticals filed a provisional patent application (No. 62/031,898) with the United States Patent and Trademark Office.  (ECF No. 156-1, PageID #4967.)  Titled "Production of Water-Soluble Hydrolyzed Clinoptilolite Fragments and Nutraceutical Products based on Water-Soluble Hydrolyzed Clinoptilolite Fragments," the application described the process Dr. Tsirikos-Karapanos developed while at LifeHealth Science.  (*See id.*, PageID #4896–97, #4967 & #5301.)

On December 31, 2014, Metron Nutraceuticals filed an international patent application bearing the same title (No. US2014/072923).  (*Id.*, PageID #4932–33.)  Substantively, it covered the same information as the provisional patent application and claimed the same priority date.  (*Id.*)  Procedurally, however, Metron Nutraceuticals filed it with the international branch of the United States Patent and Trademark Office.  (*Id.*)

#### B.1.b. Publication

Metron Nutraceuticals' international and provisional patent applications became publicly available on April 14, 2016.  (ECF No. 155-1, PageID #4026–27; *see also* ECF No. 156-1, PageID #4934.)  Metron Nutraceuticals could have withdrawn its international patent application from publication but chose not to do so.  (ECF No. 155-1, PageID #4027–28.)  According to Dr. Larry Williams, Ph.D., whom Defendants proffer as an expert, only on publication did the applications lose their status as trade secrets.  (ECF No. 160-1, PageID #6525.)

Mr. Thomas had access to the international patent application before its publication.  (ECF No. 156-1, PageID #4964 & #5075–77.)  He was copied on an e-mail between Dr. Tsirikos-Karapanos and Metron Nutraceuticals' intellectual property attorney, and the filing was an attachment to that email.  (*Id.*, PageID #4964.)  Only these three people had access to the patent applications.  (*Id.*, PageID #5180.)

### B.2.    Non-Provisional Patent Application

Notwithstanding the provisional and international patent applications, Dr. Tsirikos-Karapanos continued experimenting on how to create water-soluble zeolite clinoptilolite fragments.  (*Id.*, PageID #4890–91.)  By doing so, he discovered that the previous process only made a "good suspension."  (*Id.*, PageID #4891.)

Dr. Tsirikos-Karapanos started over from scratch.  (*Id.*)  He spent countless hours working on a new formulation and creating experimental batches.  (*Id.*, PageID #4891–92.)  After two and a half months, he perfected the process of making water-soluble zeolite clinoptilolite fragments.  (*Id.*, PageID #4885 & #4891.)  The new process involved different quantities of ingredients than the one he created while at LifeHealth Science.  (*Id.*, PageID #4891 & #4918.)  Further, it required only a one-step hydrolysis process over two days—not two steps over three days.  (*Id.*)  At that point, Dr. Tsirikos-Karapanos stopped experimenting with the process he created while at LifeHealth Science.  (*Id.*, PageID #4906.)  Indeed, Metron Nutraceuticals has not used that process to make products.  (*Id.*, PageID #4931.)

On October 9, 2015, Metron Nutraceuticals filed a non-provisional patent application (No. 14/879,233).  (*Id.*, PageID #4902.)  Because it was a continuation of the earlier provisional patent application, it had the same title and claimed that

application's benefits and priority.  (*Id.*, PageID #4967–68; *see also id.*, PageID #5329.)  In other words, the provisional application remained the "foundational basis" for Metron Nutraceuticals' process and provided support for the claimed subject matter.  (ECF No. 155-1, PageID #4000; ECF No. 156-1, PageID #4968.)  But the non-provisional application differed because it described Dr. Tsirikos-Karapanos' *new* process for making water-soluble zeolite clinoptilolite fragments.  (ECF No. 156-1, PageID #4902–03.)  Following that filing, Dr. Tsirikos-Karapanos shredded the documents memorializing his experimental process.  (*Id.*, PageID #4892.)  He worried that Metron Nutraceuticals had a "bad actor" that would steal the information.  (*Id.*)

### B.3.   Patents Issued

Ultimately, the United States Patent and Trademark Office issued Metron Nutraceuticals three patents (Nos. 9,629,874, 10,206,948, and 10,828,324)—all related to Dr. Tsirikos-Karapanos' process for making water-soluble zeolite clinoptilolite fragments.  (*Id.*, PageID #4966–75.)

### C.   Outside Interest in Metron Nutraceuticals

While Dr. Tsirikos-Karapanos perfected his process for making water-soluble zeolite clinoptilolite fragments, outsiders took an interest in Metron Nutraceuticals.

### C.1.   LifeHealth Science Lawsuit

On October 27, 2014, LifeHealth Science filed a nine-count complaint in the Northern District of Ohio against Dr. Tsirikos-Karapanos, Metron Nutraceuticals, and Mr. Thomas.  (ECF No. 157-1.)  As relevant here, the complaint alleged that those defendants "misappropriated LifeHealth Science's confidential and proprietary

information, colluded to form limited liability companies, and filed provisional patents on LifeHealth Science's products." (*Id.*, PageID #5986 (cleaned up).) The record does not indicate how that case progressed or resolved, but Plaintiff contends that a sworn statement from Moyar, the company's owner, shows the outcome. (ECF No. 168, PageID #7164.) In an affidavit dated April 24, 2019, he stated, "LifeHealth Science, LLC does not contest Dr. Tsirikos-Karapanos' ownership and rights to any and all Patents filed and/or issued as of the date of this Affidavit and any rights emanating therefrom." (ECF No. 161-5, PageID #6687.)

### C.2.   Christina Rahm Cook

In April 2015, Defendant Christina Rahm Cook began learning about zeolites. (ECF No. 156-2, PageID #5525.) Ms. Cook has a Master of Science in rehabilitation counseling and a Doctor of Education in counseling psychology, among other degrees and certificates. (*Id.*, PageID #5438–39, #5493 & #5501.) Moreover, she worked for companies like Alexion, Biogen, and Pfizer in different capacities, including as a consultant and medical liaison. (*Id.*, PageID #5518 & #5667.)

In early 2015, she met Mr. Thomas. (*Id.*, PageID #5526.) In 2019, after many of the events at issue in this lawsuit, the two married. (*Id.*, PageID #5429–30.) Interested in having her work with another individual on a product for cannabidiol and zeolites, Mr. Thomas sent Ms. Cook a packet of information. (*Id.*, PageID #5646.) It contained several documents and information that Ms. Cook believed was patented. (*Id.*)

Months later, at Mr. Thomas' invitation, Ms. Cook visited Metron Nutraceuticals' headquarters. (*Id.*, PageID #5602–04.) This day-and-a-half visit was

8

the first time that Dr. Tsirikos-Karapanos met Ms. Cook.  (ECF No. 156-1, PageID #4939.)  Mr. Thomas invited several others who also attended.  (*Id.*, PageID #4945; ECF No. 156-2, PageID #5602.)  Mr. Thomas told Dr. Tsirikos-Karapanos that these individuals could help sell Metron Nutraceuticals' products. (ECF No. 156-1, PageID #4939–40.)  Before the attendees could tour Metron Nutraceuticals' facilities, Dr. Tsirikos-Karapanos required them to sign mutual confidentiality agreements.  (*Id.*, PageID #4943.) Ms. Cook (like the other attendees) signed and toured Metron Nutraceuticals' offices and laboratories.  (*Id.*, PageID #4942–43; ECF No. 156-2, PageID #5606–07 & #5644.)  She, Mr. Thomas, and others also went to dinner with Dr. Tsirikos-Karapanos.  (ECF No. 156-1, PageID #4940.)

At one point during the visit, Dr. Tsirikos-Karapanos explained what separated Metron Nutraceuticals from its competitors.  (*See id.*, PageID #4943–44.) In his view, Metron Nutraceuticals had the only solution of water-soluble zeolite clinoptilolite fragments.  (*Id.*)  Further, Metron Nutraceuticals protected its intellectual property—by then, it had filed the provisional and international patent applications. (*Id.*) According to Ms. Cook, Dr. Tsirikos-Karapanos showed her what she believed was a patent application (*see* ECF No. 161-1, PageID #6589), though Mr. Thomas had already shown her the same document (ECF No. 156-2, PageID #5646–47).  Mr. Thomas describes Ms. Cook as having an "eidetic memory" and a strong ability to recall in detail material she has read once.  (ECF No. 155-3, PageID #4677.)  Dr. Tsirikos-Karapanos contends that he did not show Ms. Cook any

documents about how Metron Nutraceuticals makes water-soluble zeolite clinoptilolite fragments.  (ECF No. 156-1, PageID #4944.)

After the visit, Ms. Cook emailed Mr. Thomas and Dr. Tsirikos-Karapanos, thanking them and suggesting an ongoing relationship between her and Metron Nutraceuticals.  (*See* ECF No. 160-5, PageID #6582.)  Nevertheless, the two never engaged in any business together.  (ECF No. 156-1, PageID #4948.)

### C.3.    Mark E. Adams and Sozo Global, Inc.

Around June 2015, Mr. Thomas contacted Defendant Mark E. Adams.  (ECF No. 155-2, PageID #4155.)  Mr. Adams has a general Associate of Arts degree and a bachelor's degree in marketing.  (*Id.*, PageID #4135.)  At the time, Mr. Adams was the owner and chief executive officer of Sozo Global, Inc.—a multi-line marketing company.  (*Id.*, PageID #4146–47.)  Mr. Thomas represented that he was a Metron Nutraceuticals sales representative and inquired about Sozo Global selling one of Metron Nutraceuticals' zeolite products.  (*Id.*, PageID #4156.)  Although Sozo Global had never distributed a zeolite product (*id.*, PageID #4369), the interest was mutual.

### C.3.a. September 24, 2015 Supply Agreement

Effective August 25, 2015, Mr. Thomas was no longer a Metron Nutraceuticals employee.  (*Id.*, PageID #4447.)  Nonetheless, on September 24, 2015, Mr. Thomas, on behalf of Metron Nutraceuticals, and Mr. Adams, on behalf of Sozo Global, executed a patent, trademark, and supply agreement.  (*Id.*, PageID #4200–01.)  A few weeks later, Dr. Tsirikos-Karapanos learned of that agreement.  (*Id.*, PageID #4220; ECF No. 156-1, PageID #4988–89.)  He received a call from Mr. Adams, whom he had not met, to talk about the September 24, 2015 supply agreement.  (ECF No. 156-1,

PageID #4988; *see also* ECF No. 155-2, PageID #4447.)  Dr. Tsirikos-Karapanos advised Mr. Adams that the supply agreement with Sozo Global was invalid because only the president of Metron Nutraceuticals could execute such a document.  (ECF No. 156-1, PageID #4988–89.)

Notwithstanding these events, both Metron Nutraceuticals and Sozo Global wanted to enter into a new contract.  (ECF No. 155-2, PageID #4202; ECF No. 156-1, PageID #4989.)  In October 2015, Dr. Tsirikos-Karapanos claims that he verbally described confidential information and discussed patent application numbers with Mr. Adams.  (ECF No. 156-1, PageID #5175–78 & #5195.)  But he never provided Mr. Adams any written documents containing Metron Nutraceuticals' trade secrets. (*Id.*)

### C.3.b. Agreements with Sozo Global

On October 30, 2015, Metron Nutraceuticals and Sozo Global executed two documents:  (1) a mutual confidentiality agreement, in part, to protect Dr. Tsirikos-Karapanos' intellectual property (ECF No. 155-2, PageID #4202; ECF No. 156-1, PageID #4989; ECF No. 161-3, PageID #6675), and (2) an exclusive distribution and supply agreement (*see* ECF No. 161-3, PageID #6655).

### C.3.b.i. Confidentiality Agreement

Although executed on October 30, 2015, the confidentiality agreement was effective as of October 6, 2015.  (*See id.*, PageID #6675.)  Among other things, it covered (1) "any information provided by Metron which references any Metron product," (2) "any Metron product related process including . . . [any process] involving water-soluble hydrolyzed clinoptilolite fragments and any nutraceutical

products" based on the same, and (3) "any other trade secrets or nonpublic business information." (*Id.*, § 1.)   However, it did not extend to information "which is or becomes publicly available through no breach" of the agreement.   (*Id.*, § 5, PageID #6676.)   Under the agreement, confidential information had to be "maintained in confidence" for five years and could not "be copied or reproduced without the disclosing party's prior written consent." (*Id.*, §§ 3 & 9.)  Moreover, each party agreed to protect the other's confidential information "in the same manner that it protects the confidentiality of its own" proprietary and confidential information. (*Id.*, § 2, PageID #6675–76.)   The same provisions appeared in the confidentiality agreements of Mr. Thomas and Ms. Cook.  (*Compare* ECF No. 3-1, PageID #166–67, *and* ECF No. 3-2, PageID #169–70, *with* ECF No. 161-3, PageID #6675–76.)

### C.3.b.ii. Distribution and Supply Agreement

The distribution and supply agreement between Metron Nutraceuticals and Sozo Global included similar protections.  It prohibited a party from "copy[ing] or us[ing] any copyright, patent, service mark or trademark owned by, or licensed to the other without the prior written consent of the requested [p]arty . . . ." (ECF No. 161-3, § 35, PageID #6662.)   Metron Nutraceuticals' intellectual property protections, namely a list of its patent applications, were appended as an exhibit.  (*See id.*, PageID #6670.)

The distribution agreement specified that Sozo Global had the exclusive right to sell Metron Nutraceuticals' detoxification product, Renew HC. (*Id.*, § 15, PageID #6657.)  In exchange, among other things, Sozo Global agreed not to market other "hydrolyzed clinoptilolite-based products with Vitamin C." (*Id.*, § 2, PageID #6655.)

Sozo Global also agreed not to sell other products that "infringe upon [Metron Nutraceuticals'] Patent Rights . . . [and] violate the terms of Paragraph 2 of this Agreement." (*Id.*, § 17, PageID #6658.)  To assist in the sale of Renew HC, Sozo Global hired Mr. Thomas as a product manager.  (ECF No. 155-2, PageID #4172 & #4270–71.)  Mr. Adams knew that Mr. Thomas had a past relationship with Metron Nutraceuticals, that he likely had access to its confidential information, and that he might be subject to confidentiality agreements.  (*Id.*, PageID #4230.)

### D.    EnTox Solutions

In case Metron Nutraceuticals' detoxification product became unavailable, Mr. Adams sought an alternative supplier.  (*Id.*, PageID #4150, #4177, #4236 & #4267.)  To that end, Mr. Thomas introduced Mr. Adams to Ms. Cook.  (*Id.*, PageID #4154–55.)  During their initial conversation, Ms. Cook told Mr. Adams that she could make a unique zeolite detoxification product.  (*Id.*, PageID #4162.)  On several occasions, Mr. Adams emphasized the importance of novelty; he did not want Sozo Global to breach its agreement with Metron Nutraceuticals.  (*Id.*, PageID #4266–68.)  Ms. Cook repeatedly assured him he had no reason to worry.  (*Id.*)  In one email, she summarized her approach for Mr. Adams:

> I won't use any property of anyone else just what I have proven on the product.  I am allowed to use any posted provisional theory or patent [because] that is what we do.  I cannot steal an existing patent— obviously:).  We will do this the right way but quickly so we win the race as a team.

(*Id.*, PageID #4449.)  Based on these assurances, Mr. Thomas and Mr. Adams discussed job opportunities with Ms. Cook.  (*Id.*, PageID #4232.)

13

### D.1.  Formation of EnTox Solutions

On October 14, 2015, the three met at Sozo Global's office.  (*Id.*, PageID #4181–82; ECF No. 156-2, PageID #5648.)  But they disagree about the purpose of that meeting.  Ms. Cook claims that she went to meet the people with whom she would be working on the alternative product.  (ECF No. 156-2, PageID #5648.)  Mr. Thomas believed that the meeting was a "free dinner" to explore opportunities for everyone to work together.  (ECF No. 155-3, PageID #4673.)  Finally, Mr. Adams characterizes the purpose as creating a patent.  (*See* ECF No. 155-2, PageID #4241.)  In his view, being early to market and having intellectual property carries "big advantages."  (*Id.*, PageID #4238.)  "One of the strongest points in marketing of any dietary supplement is the . . . ability to claim status as 'Patent Pending' or 'Patented.'"  (ECF No. 166-1, ¶ 29, PageID #7068.)

Whatever the case, after some negotiation, Mr. Adams and Mr. Thomas realized they could not afford to hire Ms. Cook to draft the patent application.  (ECF No. 155-2, PageID #4179–81.)  So, they created a different plan.  (*Id.*, PageID #4181.)  Instead of hiring Ms. Cook, they made her a member in a new entity, Defendant EnTox Solutions, LLC, which would create Sozo Global's alternative supply.  (*Id.*, PageID #4150–51, #4161–62, #4177 & #4181.)  Ms. Cook helped draft a patent application dated October 14, 2015.  (ECF No. 156-2, PageID #5660–63.)

EnTox Solutions never had bank accounts—all company expenses were paid personally by Mr. Adams or one of the other owners.  (ECF No. 155-2, PageID #4195.)  Defendant TOP Partners Management, LLC served as the manager of EnTox Solutions.  (*Id.*, PageID #4190–91.)  Later, Ms. Cook executed a contribution

14

agreement generally assigning to EnTox Solutions her future intellectual property rights in zeolite applications.  (*Id.*, PageID #4181; *see also* ECF No. 156-2, PageID #5966–71; ECF No. 167-1, PageID #7105–06.)  In Paragraph 5 of that agreement, Ms. Cook warranted that she was "not aware of any violation, infringement, or misappropriation of any third party's rights . . . ." (ECF No. 156-2, PageID #5967.)

### D.2    Patent Applications

Following the formation of EnTox Solutions, Ms. Cook drafted two non-provisional patent applications.  In her view, Mr. Thomas and Mr. Adams wanted her to write a patent so they could sell a detox product alongside the one Metron Nutraceuticals had (*id.*, PageID #5649), though Mr. Thomas denies any involvement in the patent's creation (ECF No. 155-3, PageID #4674).  The first (No. 14/882,477) came on October 14, 2015.  (ECF No. 155-1, PageID #4029.)  It was titled "Water-Soluble Electrolyzed/Hydrolyzed Clinoptilolite Fragments and Nutraceuticals, Pharmaceutical, and Environmental Products Based Thereon."  (*See* ECF No. 156-2, PageID #5836.)

The next day, Ms. Cook revised that application and filed another (No. 14/884,669).  (ECF No. 155-1, PageID #4029; *see also* ECF No. 156-2, PageID #5836–93.)  One revision changed the title, replacing the term "hydrolyzed" with "solvolyzed."  (*See* ECF No. 156-2, PageID #5836–93.)  Both applications (1) listed Ms. Cook as the inventor and EnTox Solutions as the assignee, and (2) became public on April 20, 2017.  (*See* ECF No. 155-2, PageID #4455.)  In the end,

EnTox Solutions abandoned the first application and only pursued the revised one. (*Id.*, PageID #4455–66.)

### D.3. Drafting the Cook-EnTox Patent Applications

Plaintiff contends that much of the revised application was copied from its international patent application. (ECF No. 96, PageID #2830.) On this point, the parties' proffered experts, who compared the documents, largely agree. (ECF No. 154-3, PageID #3496–97; ECF No. 160-1, PageID #6527–28.) First, Dr. Williams, the defense expert, believes the two have a "significant overlap." (ECF No. 160-1, PageID #6528.) Second, Dr. Fernando Alberdi, Ph.D. (Plaintiff's expert who is an intellectual property lawyer), opined that Ms. Cook copied "several significant portions" to "comply[] with the requirements for obtaining a patent." (ECF No. 154-3, PageID #3496–97.)

Although Mr. Adams hired an attorney to assist her (ECF No. 155-2, PageID #4164), Ms. Cook contends that she drafted the patent applications alone (ECF No. 156-2, PageID #5657). In doing so, she referenced "a whole pile of documents" she brought for the trip. (*Id.*, PageID #5654–55.) Some were from Mr. Thomas and included documents from Metron Nutraceuticals. (*Id.*, PageID #5654–55 & #5757.) For example, Dr. Williams testified that the pile "probably" contained Metron Nutraceuticals' international patent application. (ECF No. 160-1, PageID #6530.) Other documents were from her research. (ECF No. 156-2, PageID #5654–55.) Ms. Cook claims that all documents predated her visit to Metron Nutraceuticals. (*Id.*, PageID #5736–38.) Further, Ms. Cook concedes that she might have referenced other

16

documents electronically.  (*See id.*, PageID #5655–56.)  Once done with the documents in the drafting process, Ms. Cook brought them home with her.  (*Id.*, PageID #5758.)

Ms. Cook contends that she "absolutely" told Mr. Adams' attorney that she based the patent applications on documents from Metron Nutraceuticals.  (*Id.*, PageID #5732.)  Further, she believes that Mr. Adams was in the room during that conversation.  (*Id.*)  Mr. Adams denies having any such knowledge.  (*See* ECF No. 155-2, PageID #4162.)  In his view, Ms. Cook did not bring any information "from any other source that wasn't in the public domain or wasn't original to her."  (*Id.*, PageID #4237.)

### D.4.   Challenges to the Cook-EnTox Patent Application

During the review process, the revised application faced several hurdles, which Mr. Adams paid an attorney to address.  (*Id.*, PageID #4165.)  First, in March 2019, the United States Patent and Trademark Office rejected the application for failing to meet the "enablement" requirement.  (*See* ECF No. 161-6, PageID #6695.)  To satisfy enablement, an application must be specific enough to enable another person to make or use the invention.  (ECF No. 160-1, PageID #6536.)  In an appeal brief, EnTox Solutions argued that its application adequately described "a hydrolysis reaction to fragment clinoptilolite."  (ECF No. 161-6, PageID #6699.)  Plaintiff contends that Defendants copied that process from its international patent application.  (ECF No. 168, PageID #7139.)  Satisfied with the explanation from EnTox Solutions, the Patent and Trademark Office issued a patent (No. 10,894,721) on January 19, 2021 with a priority date of October 15, 2015.  (ECF No. 155-2, PageID #4455–66.)

A few days later, Metron Nutraceuticals filed a request for *ex parte* reexamination.  (*See* ECF No. 154-10, PageID #3559–81.)  It asserted that Ms. Cook copied portions of the patent from its applications.  (*See id.*)  The Patent and Trademark Office agreed and rejected the patent's claims.  (*See* ECF No. 154-12, PageID #3592–3603.)  Following two responses from EnTox Solutions (*see* ECF No. 154-13, PageID #3604–26; ECF No. 154-14, PageID #3627–44)—explaining how its process was distinct from that of Metron Nutraceuticals—the Patent and Trademark Office confirmed the patentability of its claims in February 2022 (*see* ECF No. 154-15, PageID #3645–46).  In making this determination, the Patent and Trademark Office did *not* consider whether the application misappropriated a trade secret or broke a contractual obligation.  (ECF No. 160-1, PageID #6542.)

Metron Nutraceuticals filed another request for reconsideration (*see* ECF No. 154-18, PageID #3907–24), but the Cook-EnTox patent remains valid.  Opposing the Cook-EnTox applications and patent cost Metron Nutraceuticals over $30,000 in legal fees.  (ECF No. 165-2, ¶ 18, PageID #7061.)

E.    **Detoxification Products**

Ultimately, neither of Sozo Global's ventures into the zeolite space proved successful.  Its work with EnTox Solutions did not result in the development of an alternative detoxification product.  (ECF No. 155-2, PageID #4178–79.)  Soon after filing the Cook-EnTox patent applications, Mr. Adams realized that EnTox Solutions could not afford to pay Ms. Cook to produce the product because her expectations for compensation were too high.  (*Id.*, PageID #4180–81.)  Further, Mr. Adams worried that Ms. Cook and Mr. Thomas were creating a competing product of their own.  (*Id.*,

PageID #4170–72, #4181 & #4278–79.)  By April 2016, the business relationship between Mr. Adams, on the one hand, and Ms. Cook and Mr. Thomas, on the other, reached its end.  (*Id.*, PageID #4367–68.)

### E.1.  Sozo Global's Distribution of Products

At one point, EnTox Solutions executed a licensing agreement with a company called Youngevity International, Inc.  (*See id.*, PageID #4295–97.)  That agreement provided Youngevity International a right of first refusal to license the Cook-EnTox patent.  (*Id.*, PageID #4286–87.)  But Mr. Adams contends that Youngevity International never exercised its right.  (*Id.*)

### E.1.a. *Metron Nutraceuticals v. Sozo Global*

Sozo Global's exclusive distribution and supply agreement with Metron Nutraceuticals lasted only seven months and ended with a lawsuit.  (*See* ECF No. 154-5, PageID #3530–35.)  From January to April 2016, Sozo Global received its first (and only) order of 75,000 one-ounce bottles of Renew HC.  (ECF No. 156-1, PageID #5214–15.)  But Sozo Global had financial difficulties.  (ECF No. 155-2, PageID #4370.)  One of the company's officers diverted its top distributors away from the company, effectively draining its cash flow.  (*Id.*, PageID #4298–99.)  Without sufficient resources, Sozo Global could only cover 75% of the initial invoice.  (ECF No. 156-1, PageID #5215.) On May 24, 2016, Metron Nutraceuticals sued Mr. Adams and Sozo Global in State court for failing to pay the other 25%.  (ECF No. 155-2, PageID #4366–67.)  That lawsuit ended with a settlement—Mr. Adams personally paid the remaining balance for the company.  (*Id.*)  During settlement discussions, Metron Nutraceuticals recognized that the distribution agreement "was terminated

by [Sozo Global's] default," and it would "not entertain any proposal" to restore it. (ECF No. 154-5, PageID #3531.)

### E.1.b. Renew Interests

With Sozo Global facing insolvency, Mr. Adams tried to protect its remaining assets and inventory.  (ECF No. 155-2, PageID #4143.)  He planned to move those items and Sozo Global's shareholders to a new entity—Renew Global, Inc.  (*Id.*, PageID #4145.)  Metron Nutraceuticals granted Renew Global permission to market and distribute Renew HC.  (ECF No. 157-4, PageID #6146.)  But the shareholders wanted an LLC, not a corporation, and created Renew Interests, LLC.  (ECF No. 155-2, PageID #4145.)  Sozo Global's remaining assets and inventory, which included some of Metron Nutraceuticals' products, were transferred to Renew Interests.  (*Id.*, PageID #4143.)  Renew Global was left as an unused entity.  (*Id.*, PageID #4145.)

Renew Interests did not possess the assets and inventory for long.  It sold its assets and consigned its inventory to Youngevity International.  (*Id.*, PageID #4143–44.)  Youngevity International marketed a two-ounce version of Renew HC, though Mr. Adams contends it did not come from him.  (*Id.*, PageID #4290 & #4454.)  Similarly, Youngevity International's possession of the inventory was short-lived. After selling Renew HC worth only a few thousand dollars, the product's manufacturer issued a voluntary recall.  (*Id.*, PageID #4144 & #4293–95; *see also* ECF No. 154-8, PageID #3548.)  Given that recall, Mr. Adams believes Youngevity International discarded the remaining consigned product.  (ECF No. 155-2, PageID #4149.)

### E.2.    Products Following the Cook-EnTox Patent Applications

In the wake of the Cook-EnTox patent applications and the patent ultimately issued, Metron Nutraceuticals, Ms. Cook, and Mr. Thomas all pursued other detoxification products.

### E.2.a. ClearDrops

Metron Nutraceuticals attempted to sell a product called ClearDrops.  (*See* ECF No. 165-2, ¶ 14, PageID #7061.)   ClearDrops is a consumer-strength detoxification supplement.  (ECF No. 156-1, PageID #4887–88.)  Like the other products of Metron Nutraceuticals, it contains water-soluble zeolite clinoptilolite fragments.  (*Id.*)  Around May 2016, Metron Nutraceuticals solicited several multi-level marketing companies to serve as distributors of ClearDrops.  (ECF No. 165-2, ¶ 14, PageID #7061.)  But the presence of a competing product, which Mr. Thomas marketed as a patent-pending water-soluble clinoptilolite—Vitality Detox Drops—hindered its ability to do so.  (*Id.*, ¶¶ 15–16.)  Mr. Thomas advertised Vitality Detox Drops as developing from scientific and processing "advancement[s] . . . [that] create[d] a system of solvolysis that now can make crystals small enough to become water soluble."  (ECF No. 160-3, PageID #6577–79.)

Even after Metron Nutraceuticals found a distributor, it still saw, and continues to see, reduced sales because of Vitality Detox Drops.  (ECF No. 165-2, ¶ 17, PageID #7061; ECF No. 166-1, ¶¶ 31 & 33, PageID #7068.)  Metron Nutraceuticals had to waive its distributor's minimum purchase requirements, which it already viewed as conservative.  (ECF No. 166-1, ¶¶ 34–35, PageID #7069.)  Instead of product orders for ClearDrops, Metron Nutraceuticals' distributor routinely receives

inquiries regarding Vitality Detox Drops and a related product, CleanSlate.  (*Id.*, ¶ 32, PageID #7068.)

### E.2.b. Vitality Detox Drops and CleanSlate

Mr. Thomas remains the primary driver behind Vitality Detox Drops and CleanSlate.  (ECF No. 155-3, PageID #4588–89 & #4615–16.)  But Ms. Cook created the underlying formulations.  (*Id.*, PageID #4602.)

### E.2.b.i. Alternative Laboratories

From the outset, Mr. Thomas played a major role in creating Vitality Detox Drops.  He helped create its original label.  (*Id.*, PageID #4652–53.)  He submitted a trademark/service mark application for its product name and logo.  (*See* ECF No. 161-4, PageID #6680–86.)  And he was its first manufacturer.  (ECF No. 155-3, PageID #4615–16.)  A contract manufacturing facility named Alternative Laboratories produces the product now.  (*Id.*, PageID #4584–85.)  Between 2014 and 2022, Mr. Thomas and Ms. Cook visited Alternative Labs together two to ten times.  (*Id.*, PageID #4504; *see also* ECF No. 156-2, PageID #5702.)  Ms. Cook even worked there, creating formulas, processes, and products.  (ECF No. 155-3, PageID #4502–03; ECF No. 156-2, PageID #5701–02.)  While she worked there, EnTox Solutions believes that Ms. Cook shared the Cook-EnTox patent applications and created a competing product.  (ECF No. 155-2, PageID #4177–79.)

### E.2.b.ii. *Metron Nutraceuticals v. Clayton Thomas*

EnTox Solutions views Ms. Cook's work with Alternative Labs as violating her contribution and assignment agreement.  (*See id.*, PageID #4170–72.)  In response, it sent her attorney a cease-and-desist letter.  (*Id.*, PageID #4169–79 & #4438–44.)

22

Among other things, it demanded that Ms. Cook surrender her inventions, remit the financial benefits she received from such business opportunities, and return the confidential information in her possession.  (*Id.*, PageID #4192 & #4443.)  Ms. Cook did not comply.  (*Id.*, PageID #4192.)  According to her, she "did not knowingly create or communicate formulas with the expectation that they would be used in Vitality Detox Drops." (ECF No. 161-1, PageID #6607.)

Mr. Adams spoke with Dr. Tsirikos-Karapanos about Mr. Thomas' sale of Vitality Detox Drops.  (*See* ECF No. 164-1, PageID #6875–82.)  Without disclosing his past business relationship with Ms. Cook and Mr. Thomas, he stated that "[Mr. Thomas] is all over the Internet selling his clinoptilolite product.  This directly competes with Metron." (*Id.*, PageID #6880.)  Mr. Adams worried that Mr. Thomas' competing product could harm Sozo Global's distribution of Renew HC.  (*See id.*)

On February 22, 2016, Plaintiff filed a nine-count complaint against Mr. Thomas and his zeolite distribution company, Personalized Healthcare Solutions, LLC, in State court.  (ECF No. 157-5, ¶¶ 1–107, PageID #6164–86.)  Count five alleged trade secret misappropriation under the Ohio Uniform Trade Secrets Act.  (*Id.*, ¶¶ 72–78, PageID #6177–78.)  Specifically, it averred that "[Mr.] Thomas willfully, wrongfully, and maliciously misappropriated Metron's trade secret information . . . by removing Metron's trade secret information from Metron's offices, and . . . by publishing and using the trade secret information to compete with and/or harm Metron." (*Id.*, ¶ 77, PageID #6178.)  By doing so, Plaintiff alleged that Mr. Thomas and his company unfairly competed through "knock-off" patents, other zeolite

products, and re-labeling and selling one of its products as Vitality Detox Drops. (*Id.*, ¶¶ 31–44, PageID #6170–73.)

Plaintiff moved for default judgment. (*See* ECF No. 162-3, PageID #6723.) In June 2016, when Mr. Thomas and Personalized Healthcare Solutions failed to plead or respond within the required time, the State court granted that motion. (*Id.*, PageID #6722–25.) Further, the court ordered Mr. Thomas to pay $58,863.55 in monetary damages and to forfeit his share in Metron Nutraceuticals. (*Id.*) It also awarded permanent injunctive relief. (*Id.*) One year later, the court modified the award of monetary damages and injunctive relief. (ECF No. 156-2, PageID #5979–81.) One of the terms ordered that Mr. Thomas "shall have zero ownership or receive any financial remuneration from . . . any company involved in any zeolite based production, manufacturing, distribution, marketing or sales until June 17, 2019." (*Id.*, PageID #5980.) None of the terms addressed patent applications. (*See* ECF No. 162-3, PageID #6722–25.)

On August 24, 2017, Dr. Tsirikos-Karapanos emailed Ms. Cook a copy of the modified entry because she "executed a Mutual Confidentiality Agreement with Metron Nutraceuticals on July 16th, 2015." (ECF No. 156-2, PageID #5694–96 & #5974–81.)

### E.2.b.iii. Root Wellness, LLC and CleanSlate

After his court-ordered, two-year break from zeolites, Mr. Thomas helped sell Vitality Detox Drops again. (ECF No. 155-3, PageID #4634.) Additionally, he incorporated another company (*see* ECF No. 154-23, PageID #3976–78) and added another product to his portfolio (*see* ECF No. 155-3, PageID #4491–92.)

In July 2019, Mr. Thomas created Defendant Root Wellness, LLC.  (ECF No. 154-23, PageID #3976–78; ECF No. 155-3, PageID #4477.)  In addition to being its founder, Mr. Thomas is its sole owner and member.  (ECF No. 155-3, PageID #4477–78.)  Accordingly, Mr. Thomas claims that he serves as the company's "governing body" and is the only person authorized to transact business on its behalf.  (*Id.*, PageID #4569.)  Put simply, he "controls everything."  (*Id.*, PageID #4685.)

Ms. Cook serves as the scientist for Root Wellness and formulates its products.  (*Id.*, PageID #4514–15.)  More generally, she actively participates in the company's business and the promotion of its products.  (*Id.*, PageID #4515.)  For her help, Root Wellness agreed to pay Ms. Cook a royalty for every product sold.  (ECF No. 156-2, PageID #5552.)

Around January 2020, Root Wellness began selling CleanSlate.  (ECF No. 3, ¶ 329, PageID #135; ECF No. 83, ¶ 329, PageID #1611.)  It was marketed as containing water-soluble clinoptilolite "to help wipe yourselves clean of the toxin and heavy metals trying to take them over."  (ECF No. 155-3, PageID #4508; *see also* ECF No. 156-1, PageID #4962–63; ECF No. 166-1, ¶ 31, PageID #7068.)  Dr. Tsirikos-Karapanos does not know whether CleanSlate uses his technology.  (ECF No. 156-1, PageID #5086.)  Although manufactured in the United States (ECF No. 155-3, PageID #4582), it is shipped to roughly 55 countries (*id.*, PageID #4601).  In 2020, the product generated over $1.1 million in revenue for Root Wellness.  (*Id.*, PageID #4724.)  Given her royalty deal, Ms. Cook is entitled to a portion of that amount.  (*Id.*, PageID #4574.)

25

Mr. Adams was not involved in the manufacturing, distribution, or sale of either Vitality Detox Drops or CleanSlate. (ECF No. 154-20, PageID #3941–42.) Nor has he received any profits, royalties, or other financial benefits from their sale. (*Id.*, PageID #3941.)

Plaintiff contends that Vitality Detox Drops and CleanSlate are the same product. (ECF No. 168, PageID #7148.) Ms. Cook has not admitted that claim. She testified that she is "unaware of which [of her] formula[s]" is used to create CleanSlate. (ECF No. 161-1, PageID #6604–05.) However, Mr. Thomas stated that the solutions for the two products are the same. (ECF No. 155-3, PageID #4492.) Moreover, Alternative Labs manufactures each (*id.*, PageID #4582 & #4584–85), and Root Wellness funnels their production through Bootheel Lab Corporation (*id.*, PageID #4588–90). Mr. Thomas owns Bootheel Lab and "controls the rights to different formulas and products," including Vitality Detox Drops and CleanSlate. (*Id.*, PageID #4531, #4533 & #4546–48.) Bootheel Lab purchased the rights to Vitality Detox Drops from Ms. Cook or one of her entities. (*Id.*, PageID #4602.)

### E.2.b.iv. Intellectual Property

Vitality Detox Drops and CleanSlate were previously marketed and labeled as "patent pending." (*Id.*, PageID #4508, #4653 & #4692.) More recently, Ms. Cook and Mr. Thomas refer to them as "patented." In February 2021, Mr. Thomas called Metron Nutraceuticals' exclusive distributor of ClearDrops and demanded that it take down its materials comparing ClearDrops, CleanSlate, and Vitality Detox Drops. (ECF No. 166-1, ¶ 17, PageID #7066.) He represented that the Cook-EnTox patent protected both CleanSlate and Vitality Detox Drops. (*Id.*, ¶ 18, PageID

26

#7066–67.)  Mr. Thomas made a similar representation to one of the distributor's advisors.  (*See id.*, ¶¶ 20–21, PageID #7067.)  In June 2022, Root Wellness held a social media broadcast.  (*Id.*, ¶ 19.)  Ms. Cook stated that CleanSlate was patented and that she owned the underlying patent.  (*Id.*)

In August and September 2022, Root Wellness held two more broadcasts that featured Mr. Thomas.  (*Id.*, ¶¶ 25–26, PageID #7068.)  To be clear, these are different videos than those at issue in Plaintiff's motion for civil contempt dated April 20, 2022. (*See* ECF No. 141.)  During these broadcasts, Mr. Thomas showed the Cook-EnTox patent to prove that CleanSlate was patented.  (ECF No. 166-1, ¶¶ 25–26, PageID #7068.)  Mr. Thomas' representations contradict Ms. Cook's testimony that she has never used the Cook-EnTox patent and did not authorize others to do so. (ECF No. 156-2, PageID #5739–40.)  They also contradict his testimony.  (*See* ECF No. 155-3, PageID #4509–10.)

Ms. Cook testified that other patent applications protect CleanSlate, though none includes the entire formula.  (ECF No. 156-2, PageID #5741.)  By her estimate, she filed fourteen patent applications in 2019 and 2020 and ten full patents in 2021. (*Id.*)  Nevertheless, Dr. Alberdi, Plaintiff's proffered expert, could not locate any other patents, patent applications, or filings on Ms. Cook's behalf or listing her as the inventor.  (ECF No. 154-3, PageID #3510.)

## STATEMENT OF THE CASE

On July 13, 2020, Plaintiff brought this action in State court against Ms. Cook, Mr. Thomas, and three entities associated with them, including Root Wellness, and

Defendants removed. (ECF No. 1.) On August 17, 2020, Plaintiff filed an amended complaint, asserting seven counts against thirteen Defendants (three individuals—Mr. Adams, Ms. Cook, and Mr. Thomas—and ten entities). (ECF No. 3.) Specifically, it alleges (1) misappropriation of trade secrets under State law (Count I) against all Defendants; (2) breach of contract (Count III) against Mr. Adams, Ms. Cook, Mr. Thomas, and EnTox Solutions; (3) tortious interference (Count IV) against Mr. Adams, Ms. Cook, and Mr. Thomas and (4) fraudulent misrepresentation (Count V) against Mr. Adams. (*Id.*, ¶¶ 407–82, PageID #144–59.) As remedies, Plaintiff seeks a mandatory injunction for its State-law misappropriation claim (Count II), individual liability through veil piercing from Mr. Adams, Ms. Cook, and Mr. Thomas (Count VI), and a preliminary injunction against all Defendants (Count VII). (*Id.*, ¶¶ 431–38 & 483–518, PageID #148–49 & #159–64.)

Ms. Cook counterclaimed against Metron Nutraceuticals, alleging (1) breach of contract; (2) quantum meruit; and (3) trade secret misappropriation. (ECF No. 28, ¶¶ 19–41, PageID #403–05.)

## A. Notice of Intellectual Property at Issue

On May 11, 2021, to facilitate its pretrial management of the case, the Court ordered Plaintiff to file a short notice that, among other things, "briefly identifies the intellectual property at issue." (Minute Order, May 11, 2021.) Responding to that order, Plaintiff identified two trade secrets in a 26-page submission: (1) its international patent application; and (2) lab reports for one of Metron Nutraceuticals' former products, CytoDetox. (*See* ECF No. 96, PageID #2829–31.) On summary judgment, Plaintiff focuses only on the former. In its notice, Plaintiff also identified

28

seventy-three alleged misappropriations of those trade secrets.  (*Id.*, PageID #2833–53.)  Seventy-two compared the language of Metron Nutraceuticals' international patent application with that of the revised Cook-EnTox patent application, dated October 15, 2015.  (*Id.*, PageID #2833–52.)  For purposes of Rule 56, the Court finds that this document is of sufficient evidentiary quality, akin to a discovery response or party admission, and will consider it in resolving Defendants' motion.

### B.    Claims and Parties at Issue

The parties filed cross-motions for summary judgment.  (ECF No. 159; ECF No. 168.)  Defendants jointly move for summary judgment on all counts of Plaintiff's amended complaint.  (ECF No. 159.)  Plaintiff moves for summary judgment on Ms. Cook's counterclaim.  (ECF No. 168.)  In their respective responses to the other party's motion, Plaintiff and Ms. Cook agreed to dismiss some claims and parties.  Neither specifies the grounds on which it relies in requesting dismissal.  (*See id.*, PageID #7178–79; ECF No. 169, PageID #7210.)  Nevertheless, the Court analyzes their requests under the different standards governing each.

### B.1.   Ms. Cook's Dismissal

Ms. Cook agreed to dismiss the entirety of her counterclaim.  (ECF No. 169, PageID #7210; *see also* ECF No. 170, PageID #7214.)  Where a counterclaim-defendant has filed a motion for summary judgment and will not stipulate to dismissal "an action may be dismissed at the [counterclaimant's] request only by court order, on terms that the court considers proper."  *Bridgeport Music, Inc. v. Universal-MCA Music Pub., Inc.*, 583 F.3d 948, 953 (6th Cir. 2009) (quoting Fed. R. Civ. P. 41(a)(2)); *see* Fed. R. Civ. P. 41(c).  Generally, this type of dismissal is without

29

prejudice.  Fed. R. Civ. P. 41(a)(2).  Requiring court approval "protect[s] the nonmovant from unfair treatment."  *Grover by Grover v. Eli Lilly & Co.*, 33 F.3d 716, 718 (6th Cir. 1994) (citation omitted).

Whether to grant dismissal and on what terms rests "within the sound discretion of the district court."  *Id.* (citing *Banque de Depots v. National Bank of Detroit*, 491 F.2d 753, 757 (6th Cir. 1974)).  In exercising this discretion, courts consider whether "the defendant would suffer 'plain legal prejudice' as a result of a dismissal without prejudice, as opposed to facing the mere prospect of a second lawsuit."  *Id.* (citation and quotation omitted).  To determine whether a defendant will suffer plain legal prejudice, courts consider factors such as:  (1) "the defendant's effort and expense of preparation for trial," (2) "excessive delay and lack of diligence on the part of the plaintiff in prosecuting the action," (3) "insufficient explanation for the need to take a dismissal," and (4) "whether a motion for summary judgment has been filed by the defendant."  *Id.* (citation omitted).

On the record presented, those factors favor dismissal *with* prejudice.  Ms. Cook's counterclaim has been pending for over two-and-a-half years.  (*See* ECF No. 28.)  In that time, Metron Nutraceuticals has answered (ECF No. 34), completed discovery which included depositions (*see, e.g.*, ECF No. 156-2), and moved for summary judgment on those claims (ECF No. 168).  Indeed, only *after* Metron Nutraceuticals moved for summary judgment did Ms. Cook, "upon full consideration of the information exchanged in discovery . . . elect[] not to proceed with her counterclaim."  (ECF No. 169, PageID #7210.)  Perhaps the only factor weighing

30

against dismissal with prejudice is that Ms. Cook has not unreasonably delayed the prosecution of her action. But given the weight of the factors cutting the other way, the Court finds, on balance, that Metron Nutraceuticals would suffer plain legal prejudice, not merely the prospect of a second lawsuit.

For these reasons, the Court exercises its discretion to dismiss Ms. Cook's counterclaim with prejudice. Therefore, the Court **GRANTS** Ms. Cook's motion and **DISMISSES** her counterclaim **WITH PREJUDICE** under Rule 41(a)(2). Accordingly, the Court **DENIES AS MOOT** Metron Nutraceuticals' cross-motion for summary judgment. (ECF No. 168.)

### B.2.    Metron Nutraceuticals' Dismissal

Plaintiff agreed to dismiss (1) Counts II, IV, and V in full, (2) Count III as to EnTox Solutions, and (3) Defendants Dr. Christina Rahm, LLC; Dr. Christina Ventures Incorporated; Cure the Causes, Inc.; Merci Dupre LLC; DC2 Holdings, LLC; DC2 Healthcare LLC; and Simply Wholeistic, Inc. in their entirety. (*Id.*, PageID #7178–79.) Defendants consent to dismissal and request that it be with prejudice. (ECF No. 169, PageID #7187.)

A plaintiff seeking to dismiss fewer than all claims or parties must do so under Rule 21. *See Philip Carey Mfg. Co. v. Taylor*, 286 F.2d 782, 785 (6th Cir. 1961); *Sheet Metal Workers' Nat'l Pension Fund Bd. of Trustees v. Courtad, Inc.*, No. 5:12-cv-7238, 2013 WL 3893556, at *4 (N.D. Ohio July 26, 2013). Accordingly, the Court construes Plaintiff's request for dismissal as a motion under that rule.

Rule 21 provides, "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against any party."

Fed. R. Civ. P. 21.  Generally, dismissal under Rule 21 requires courts to consider prejudice to the non-moving party.  *Dix v. Atos IT Sols. & Servs., Inc.*, No. 1:18-cv-275, 2020 WL 6064646, at \*2 (S.D. Ohio Mar. 17, 2020) (citing *Wilkerson v. Brakebill*, No. 3:15-cv-435, 2017 WL 401212, at \*2 (E.D. Tenn. Jan. 30, 2017)); *United States v. Roberts*, No. 5:19-cv-234-JMH, 2019 WL 6499128, at \*2 (E.D. Ky. Dec. 3, 2019) (same).  To do so, the "plain legal prejudice" factors used for motions under Rule 41, outlined above, come into play.  *Dix*, 2020 WL 6064646, at \*2.

Applied to Plaintiff's motion, those factors support dismissal with prejudice. As to the fourth, Defendants moved for summary judgment on those claims.  (ECF No. 159.)  Before doing so, they expended significant effort and expense to answer Plaintiff's amended complaint (*see, e.g.*, ECF No. 25; ECF No. 39) and complete discovery.  Further, Plaintiff attempted to delay a decision on the merits, namely, through motions unrelated to the underlying dispute.  (*See* ECF No. 146, PageID #3467.)  Finally, Plaintiff moves to dismiss several claims and parties but provides little explanation, stating only, regarding Count V, that "adequate remedies are available against Adams under the Ohio Uniform Trade Secrets Act and for breach of contract."  (ECF No. 168, PageID #7178.)

Accordingly, the Court finds that Defendants would suffer plain legal prejudice, **GRANTS** Plaintiff's motion, and **DISMISSES WITH PREJUDICE** the claims and parties as specified above.

### B.3.   Remaining Claims

After these procedural developments, only two of Plaintiff's substantive counts remain:   (1) misappropriation of trade secrets (Count I) against all remaining

Defendants (identified below), and (2) breach of contract (Count III) against Mr. Adams, Ms. Cook, and Mr. Thomas.  Plaintiff also stands on Counts VI (piercing the corporate veil) and Count VII (seeking a preliminary injunction).  Further, only three corporate defendants—Root Wellness, EnTox Solutions, and TOP Partners Management—and the three individual defendants remain.

## ORAL ARGUMENT

Initially, Plaintiff and Defendants requested oral argument on their respective motions for summary judgment.  (ECF No. 159, PageID #6428; ECF No. 168, PageID #7113.)  In doing so, Defendants certified that a less-experienced lawyer would deliver a portion of their argument.  (ECF No. 159, PageID #6428.)  Therefore, pursuant to Section 15.A. of its Civil Standing Order, the Court indicated it would schedule oral argument after the close of briefing once it was prepared for argument and its trial schedule allowed.  (Order, Dec. 19, 2022.)

On January 4, 2023, Defendants jointly withdrew their request for oral argument.  (ECF No. 170, PageID #7213.)  In their view, oral argument by a less-experienced lawyer was no longer necessary because briefing on the motions "significantly narrowed the claims and issues."  (*Id.*, PageID #7214.)  Nevertheless, counsel for Ms. Cook maintains that oral argument would still benefit the process of deciding the parties' respective motions.  (*Id.*, PageID #7214–15.)

After review of the summary-judgment record, the Court exercises its discretion not to hold oral argument.  During pretrial management of this case, the Court held some thirteen status conferences and hearings that provided it with ample

familiarity with the parties' respective claims and defenses.  Further, the parties' 171 pages of briefing adequately frame the issues for review.  On this record, the Court finds that ruling without oral argument better serves the interest of judicial economy by preserving the resources of the Court and the parties.  Indeed, based on the Court's experience in this matter, oral argument would prove counterproductive and serve to confuse the facts of record and governing law.

## ANALYSIS

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). On a motion for summary judgment, the Court must view evidence in the light most favorable to the non-moving party.  *Kirilenko-Ison v. Board of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 660 (6th Cir. 2020) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

On a motion for summary judgment, the moving party has the initial burden of establishing that there are no genuine issues of material fact as to an essential element of the claim or defense at issue.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 & n.12 (6th Cir. 1989); *Chappell v. City of Cleveland*, 584 F. Supp. 2d 974, 988 (N.D. Ohio 2008).  "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus.*, 475 U.S. at 586.

34

On summary judgment, the central inquiry "determin[es] whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Generally, a district court "will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter." *Kermavner v. Wyla, Inc.*, 250 F. Supp. 3d 325, 329 (N.D. Ohio 2017) (citing *Anderson*, 477 U.S. at 249). A district court only examines "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

If a genuine dispute exists, meaning "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment is not appropriate. *Tokmenko v. MetroHealth Sys.*, 488 F. Supp. 3d 571, 576 (N.D. Ohio 2020) (citing *Anderson*, 477 U.S. at 250). However, if "the evidence is merely colorable or is not significantly probative," summary judgment for the movant is proper. *Id.* The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson*, 477 U.S. at 247–48).

## I. Plaintiff's Substantive Claims

Defendants move for summary judgment on Plaintiff's remaining two substantive claims for misappropriation of trade secrets under the Ohio Uniform Trade Secrets Act and breach of contract. (*See* ECF No. 159-1, PageID #6461–88.) The Court addresses those claims in reverse order.

35

### I.A.    Breach of Contract

Plaintiff asserts that Mr. Adams, Ms. Cook, and Mr. Thomas breached their mutual confidentiality agreements.  Defendants contend that, in any event, Plaintiff lacks damages.  (ECF No. 159-1, PageID #6483–87.)  Additionally, Defendants argue that the Ohio Uniform Trade Secrets Act preempts Plaintiff's breach of contract claim.  (*Id.*, PageID #6481–83; *see also id.*, PageID #6485 (indicating that Ms. Cook, Mr. Thomas, and their entities join Mr. Adams and his entities' preemption argument).)

### I.A.1. Preemption

Defendants base their preemption argument on Section 1333.67(A) of the Ohio Revised Code (*see id.*, PageID #6481), which "displace[s] conflicting tort, restitutionary, and other [Ohio] laws . . . providing civil remedies for misappropriation of a trade secret."  Ohio Rev. Code § 1333.67(A).  The Ohio Supreme Court has not yet defined the scope of that statute's preemption.  *Safelite Grp., Inc. v. Lockridge*, No. 2:21-cv-4558, 2023 WL 2374863, at *7 (S.D. Ohio Mar. 6, 2023) (citing, among other cases, *Stolle Mach. Co., LLC v. RAM Precision Indus.*, 605 F. App'x 473, 484 (6th Cir. 2015)).  Accordingly, the Court must predict how the Ohio Supreme Court would rule if it considered the issue.  *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001); *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999).

For its part, the Sixth Circuit interprets Section 1333.67(A) broadly to preempt "not only causes of action for misappropriation of trade secrets but also causes of action that are based in some way on misappropriation of trade secrets."  *Stolle*

*Mach.*, 605 F. App'x at 484.  Generally, Ohio appellate courts do too.  *See, e.g.*, *Sal's Heating & Cooling Inc. v. BERS Acquisition Co., LLC*, 2022-Ohio-1756, 192 N.E.3d 537, ¶¶ 49–50 (Ohio Ct. App.) ("[e]mbracing [*Stolle Machinery*'s] broader approach").  Under this approach to preemption under the statute, a court must "determine whether 'the claims are no more than a restatement of the same operative facts' that form[] the basis of the plaintiff's statutory claim for trade secret misappropriation."  *Stolle Mach.*, 605 F. App'x at 484–85 (quoting *Thermodyn Corp. v. 3M Co.*, 593 F. Supp. 2d 972, 989 (N.D. Ohio 2008)).  A claim that restates the same facts is preempted regardless of whether the underlying information ultimately constitutes a trade secret.  *Ecolab, Inc. v. Glanz*, No. 1:22-cv-197, 2023 WL 2655652, at *5 (S.D. Ohio Mar. 27, 2023) (citation omitted).

Here, to determine whether Section 1333.67(A) preempts Plaintiff's breach of contract claim, the Court must compare the basis for that claim and Plaintiff's claim for misappropriation of trade secrets.  Among other elements, a claim for breach of contract requires a plaintiff to prove a breach.  *In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d 265, 276 (6th Cir. 2019) (citing *Claris, Ltd. v. Hotel Dev. Servs., LLC*, 2018-Ohio-2602, 104 N.E.3d 1076, ¶ 28 (Ohio Ct. App.)).  To do so here, Plaintiff maintains that Defendants failed to maintain and return, improperly disclosed, and used confidential information in violation of their mutual confidentiality agreements.  Those agreements define "confidential information" to include "trade secrets" and "any information . . . [referencing] any Metron product related process."  (*See, e.g.*, ECF No. 161-2, § 1, PageID #6675.)  Therefore, at bottom,

Plaintiff's claim for breach of contract targets Defendants' alleged disclosure and use of information from Metron Nutraceuticals' international patent application.

Plaintiff's claim for misappropriation of trade secrets relies on the same operative facts.  It too focuses on Metron Nutraceuticals' trade secrets, namely, those contained in its international patent application.  Further, that claim involves essentially the same bad acts—Defendants removed the trade secrets from Metron Nutraceuticals' offices, disclosed and published them to third parties, and used them to compete against Metron Nutraceuticals.  Accordingly, the Ohio Uniform Trade Secrets Act preempts Plaintiff's breach of contract claim.

In addition to relying on the same operative facts, Plaintiff seeks the same remedies on its claims for breach of contract and misappropriation of trade secrets. Plaintiff appears to attempt to preserve its breach of contract claim by disclaiming injunctive relief on the claim for misappropriation of trade secrets.  (ECF No. 168, PageID #7178 (agreeing to an entry of dismissal as to Count II).)  As a result of this maneuver, Plaintiff only seeks injunctive relief on its contract claim.  And the parties' contracts at issue provide for injunctive relief.  (ECF No. 3-1, § 8, PageID #167; ECF No. 3-2, § 8, PageID #170; ECF No. 161-3, § 8, PageID #6676.)  This procedural tactic has no relevance.  After all, the legal analysis focuses not on the remedies sought but the operative facts.

### I.A.2. Plaintiff's Counterarguments

Plaintiff contends that Section 1333.67(B)(1) precludes preemption.  (ECF No. 168, PageID #7175.)  That section of the statute exempts from subsection (A)'s displacement of "conflicting tort, restitutionary, and other" laws "[c]ontractual

38

remedies, whether or not based on misappropriation of a trade secret." Ohio Rev. Code § 1333.67(B)(1). According to Plaintiff, its claim for breach of contract falls within this savings statute. (ECF No. 168, PageID #7175.)

In interpreting Section 1333.67(B)(1), the Court again must predict how the Ohio Supreme Court would rule because it has not yet addressed the scope of that statute either. When construing statutes, Ohio courts seek to "determine and give effect to the intent of the General Assembly as expressed in the language it enacted." *Pelletier v. Campbell*, 153 Ohio St. 3d 611, 2018-Ohio-2121, 109 N.E.3d 1210, ¶ 14 (citations omitted). To determine that intent, a court begins with the statute's plain language. *Carnes v. Kemp*, 104 Ohio St. 3d 629, 2004-Ohio-7107, 821 N.E.2d 180, ¶ 16; *Sugarcreek Twp. v. Centerville*, 133 Ohio St. 3d 467, 2012-Ohio-4649, 979 N.E.2d 261, ¶ 19. If that language is plain and unambiguous, the Court need not apply the rules of statutory construction because such a statute is applied, not interpreted. *Pelletier*, 2018-Ohio-2121, at ¶ 14.

Applying these principles here, the Court determines that Section 1333.67(B)(1)'s plain language does not categorically exempt breach of contract claims from preemption, as Plaintiff contends. The General Assembly's adoption of different language in subsections (A) and (B)(1) explains why. Section 1333.67(A) broadly preempts conflicting Ohio *laws* that provide civil remedies—it "displace[s] conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret." Ohio Rev. Code § 1333.67(A). In contrast, Section 1333.67(B)(1) saves from preemption only

39

"[c]ontractual *remedies*."  *Id.* § 1333.67(B)(1) (emphasis added).  In other words, the savings clause in subsection (B)(1) does not extend as far as the general preemption in subsection (A).  On its face, it only exempts from preemption contractual remedies that differ from those available under the Ohio Uniform Trade Secrets Act.

The parties' mutual confidentiality agreements contain no such remedies.  (*See* ECF No. 3-1, PageID #166–68; ECF No. 3-2, PageID #169–71; ECF No. 161-3, PageID #6675–78.)  At most, they specify that "remedies at law will be inadequate . . . [so] each party agrees" that the other may seek or receive "injunctive relief . . . in addition to any other rights and remedies available to it."  (ECF No. 3-1, § 8, PageID #167; ECF No. 3-2, § 8, PageID #170; ECF No. 161-3, § 8, PageID #6676.)  But the Ohio Uniform Trade Secrets Act already makes injunctive relief available to plaintiffs facing actual or threatened misappropriation.  Ohio Rev. Code § 1333.62; *Stolle Mach.*, 605 F. App'x at 481.  Accordingly, the record shows that there is no contractual remedy here for Section 1333.67(B)(1) to save from preemption.

To be sure, a few cases (none of which Plaintiff cites) appear to accept a broad exemption for all breach of contract claims.  *See Tomaydo-Tomahhdo L.L.C. v. Vozary*, 2017-Ohio-4292, 82 N.E.3d 1180, ¶ 34 (Ohio Ct. App.) ("[T]he [lower] court correctly recognized that preemption of the trade secrets act does not apply to contract claims."); *Key Realty, Ltd. v. Hall*, 2021-Ohio-26, ¶ 26, *opinion vacated and superseded on reconsideration*, 2021-Ohio-1868, 173 N.E.3d 831, ¶ 26 (Ohio Ct. App.) ("Appellant's breach of contract claim is not precluded by its misappropriation of

trade secrets claim."); *see also Office Depot, Inc. v. Impact Off. Prod., LLC*, No. 1:09-cv-2791, 2011 WL 4833117, at *18 (N.D. Ohio Oct. 12, 2011).

In the Court's view, none accurately forecasts how the Ohio Supreme Court would rule on the issue. These decisions fail to account for the use of different language in subsections (A) and (B)(1)—"laws" versus "remedies," respectively—to determine and give effect to the intent of the General Assembly as expressed in the language of the statute. Indeed, each merely says that subsection (B)(1) excepts claims for breach of contract with no further analysis. Only one case Plaintiff cites even involved claims for both misappropriation of trade secrets and breach of contract (ECF No. 168, PageID #7175), but it contains no analysis of the statutory text either. *See Sal's Heating & Cooling*, 2022-Ohio-1756, at ¶ 47.

*     *     *

For these reasons, the Court determines that the Ohio Uniform Trade Secrets Act preempts Plaintiff's breach of contract claim and **GRANTS** Defendants' motion for summary judgment as to that claim, leaving Plaintiff with its substantive claim for misappropriation of trade secrets—which has been the primary source of contention between the parties in this litigation.

### I.B.  Misappropriation of Trade Secrets

Ohio's Uniform Trade Secrets Act governs claims for misappropriation of trade secrets. Ohio Rev. Code §§ 1333.61–1333.69. It defines misappropriation as the "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." *Id.* § 1333.61(B)(1). Misappropriation also includes the "[d]isclosure or use of a trade secret of another

without the express or implied consent of the other person," if acquired by improper means, in breach of a duty of secrecy, or with the knowledge that it was a trade secret and had been acquired by accident or mistake.  *Id.* § 1333.61(B)(2).  Improper means include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  *Id.* § 1333.61(A).

Here, Plaintiff maintains that Defendants misappropriated the trade secrets contained in its international patent application and used them in drafting, filing, and pursuing the Cook-Entox patent applications.  Defendants argue that Plaintiff's claim is time-barred as to Ms. Cook and Mr. Thomas and, on several grounds, fails on its merits.  (ECF No. 159-1, PageID #6461–80.)  The Court addresses Defendants' arguments in turn.

### I.B.1. Statute of Limitations

Ohio's Uniform Trade Secrets Act contains a four-year statute of limitations. Ohio Rev. Code § 1333.66.  A claim under the Act accrues when "the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." *Id.*  This discovery rule "requires the owner of a trade secret to conduct a timely and reasonable investigation after learning of possible misappropriation."  *Adcor Indus., Inc. v. Bevcorp, LLC*, 252 F. App'x 55, 62 (6th Cir. 2007).

Plaintiff commenced this lawsuit in State court on July 13, 2020.  (ECF No. 1.) Therefore, the Court must determine whether, before July 13, 2016, Plaintiff knew of the misappropriation or facts that would have led "a fair and prudent man, using ordinary care and thoughtfulness, to make further inquiry."  *Kehoe Component Sales*

*Inc. v. Best Lighting Prods., Inc.*, 933 F. Supp. 2d 974, 1016 (S.D. Ohio 2013) (citing *Hambleton v. R.G. Barry Corp.*, 12 Ohio St. 3d 179, 181, 465 N.E.2d 1298 (1984)).  If so, Plaintiff's claim is time-barred.

### I.B.1.a. Plaintiff's Knowledge Before July 13, 2016

Ms. Cook and Mr. Thomas argue that Plaintiff had knowledge of the basis for its claims before July 13, 2016 based on Metron Nutraceuticals' prior suit against Mr. Thomas.  (ECF No. 159-1, PageID #6474–75.)  Plaintiff disagrees and contends that it did not have reason to know of Defendants' alleged misappropriation until the Cook-Entox patent application was published in April 2017.  (ECF No. 168, PageID #7174.)

In February 2016, Plaintiff filed suit against Mr. Thomas in State court.  (ECF No. 157-5, ¶¶ 1–107, PageID #6164–86.)  Its complaint included a claim for trade secret misappropriation and allegations that Mr. Thomas "remov[ed] Metron's trade secret information from [its] offices," "publish[ed] and us[ed]" the information, and sought to "knock off" Metron Nutraceuticals' patent.  (*Id.*, ¶¶ 43 & 77, PageID #6173 & #6178.)  Further, that lawsuit accused Mr. Thomas of re-labeling and selling one of Metron Nutraceuticals' products as Vitality Detox Drops.  (*Id.*, ¶ 38, PageID #6172.)

Though worded differently, the present lawsuit makes materially similar allegations.  (*See* ECF No. 3, ¶¶ 407–30, PageID #144–48.)  Plaintiff also developed these facts in discovery as laid out above.  By previously pursuing the same theories in State court, Metron Nutraceuticals affirmed that it possessed good grounds for its

claims in February 2016.  *See* Ohio R. Civ. P. 11.  By May 2016, Mr. Thomas marketed Vitality Detox Drops as patent pending.  (ECF No. 165-2, ¶¶ 15–16, PageID #7061.)

Based on these undisputed facts, and by its own certification when filing suit in State court, Metron Nutraceuticals either knew of Mr. Thomas' alleged misappropriation or had grounds to investigate before July 2016.  *New Tech. Prod. Pty Ltd. v. Scotts Miracle-Gro Co.*, 3d Dist. Union No. 14-21-22, 2022-Ohio-3780, ¶ 73 (Ohio Ct. App.) (holding that a plaintiff discovered an alleged misappropriation where it was "confident enough" to accuse the defendants of misappropriation).

A reasonable person in Dr. Tsirikos-Karapanos' position would have also investigated Ms. Cook's involvement before July 13, 2016.  By his own admission, in July 2015, he knew of the close relationship between her and Mr. Thomas and that she was interested in selling detoxification products.  (ECF No. 156-1, PageID #4945; *see also id.*, PageID #4939–40; ECF No. 160-5, PageID #6582.)  Ms. Cook executed a Mutual Confidentiality Agreement with Metron Nutraceuticals on July 16, 2015. (ECF No. 156-2, PageID #5694–96 & #5974–81.)  Later, Dr. Tsirikos-Karapanos emailed a copy of the State court's default judgment to Ms. Cook.  (*Id.*) Notwithstanding the undisputed record showing that Metron Nutraceuticals had sufficient knowledge to bring claims against Mr. Thomas in early 2016, at which time it also knew of Ms. Cook's involvement with detoxification products and her relationship with Mr. Thomas, Metron Nutraceuticals failed to timely investigate its concerns giving rise to this lawsuit, and no jury could find otherwise.

44

### I.B.1.b. Plaintiff's Counterarguments

Plaintiff's argument that the statute of limitations accrued only when the Cook-Entox patent application became public (ECF No. 168, PageID #7174) misses the mark.  According to Plaintiff, only then did it know or have reason to know "that [Defendants] had misappropriated [its international patent application] to draft, file, and prosecute the Cook-Entox [a]pplication."  (*Id.*)  While publication might have provided Plaintiff actual knowledge of the alleged misappropriation, Ohio's Uniform Trade Secrets Act does not require such certainty.

"[A] plaintiff need not be aware of 'all the relevant facts that [are] necessary to file a claim' for the discovery rule to apply."  *New Tech. Prod. Pty*, 2022-Ohio-3780, at ¶ 74 (quoting *Herrick v. Zaghlool*, 3d Dist. Crawford No. 3-22-02, 2022-Ohio-2994, ¶ 14 (Ohio Ct. App.)).  Instead, a plaintiff need only know facts that would lead a reasonable person to make further inquiry.  *Kehoe Component Sales*, 933 F. Supp. 2d at 1016.  As explained above, Metron Nutraceuticals possessed such knowledge by February 2016 when it filed suit against Mr. Thomas and in May 2016 based on the marketing of Vitality Detox Drops.

Nor does it matter, as Plaintiff argues (*see* ECF No. 168, PageID #7174), that Metron Nutraceuticals' suit against Mr. Thomas ended without discovery or that the requested and ordered relief did not address patent applications.  Given those deficiencies, Plaintiff effectively asks the Court to ignore Plaintiff's Rule 11 basis for filing suit.  But the Ohio Uniform Trade Secrets Act does not permit the Court to do so.  The statute's discovery rule required Metron Nutraceuticals "to conduct a timely and reasonable investigation after learning of possible misappropriation," *Adcor*

45

*Indus.*, 252 F. App'x at 62, regardless of how its claim against Mr. Thomas progressed or its outcome. Any argument to the contrary seeks authorization for serial litigation involving the same claims and operative facts. Because Metron Nutraceuticals claimed, with good grounds, that Mr. Thomas pursued a potential knock-off patent in February 2016, it had to investigate further. Its failure to do so bars its claim now.

In short, Plaintiff's litigiousness gives rise to the time-bar defense that Ms. Cook and Mr. Thomas successfully advance. The record demonstrates its willingness to use and abuse the legal system. (*See, e.g.*, ECF No. 99; ECF No. 101; ECF No. 141; ECF No. 155-2, PageID #4366–67 (describing Metron Nutraceuticals' suit against Mr. Adams and Sozo Global); ECF No. 157-5, ¶¶ 1–107, PageID #6164–86.) Plaintiff's failure to vindicate its rights when it had the chance bars its claims against Ms. Cook and Mr. Thomas as untimely.

\*     \*     \*

For these reasons, Plaintiff's claim for trade secret misappropriation against Ms. Cook and Mr. Thomas is time-barred. Accordingly, the Court **GRANTS** their motion for summary judgment as to that claim.

### I.B.2. Merits

That leaves Plaintiff's misappropriation of trade secrets claim against Mr. Adams and the three remaining corporate defendants. Those defendants move for summary judgment, arguing that Plaintiff's claim fails on its merits on at least five grounds—only one of which the Court need address. (ECF No. 159-1, PageID #6463–68 & #6469–74.)

46

### I.B.2.a. Trade Secret

To prevail on a claim for misappropriation under Ohio law, "a plaintiff must prove:  (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret." *Advance Wire Forming, Inc. v. Stein*, No. 1:18-cv-723, 2020 WL 5026523, at *19 (N.D. Ohio Aug. 25, 2020) (citing *Tomaydo-Tomahhdo*, 2017-Ohio-4292, at ¶ 9); *see also Heartland Home Fin., Inc. v. Allied Home Mortg. Cap. Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008.  Under Ohio law, a "trade secret" means information that: "(1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  *AK Steel Corp. v. Pittsburgh Logistics Sys., Inc.*, No. 1:16-cv-1032, 2017 WL 194349, at *3 (S.D. Ohio Jan. 18, 2017) (citing Ohio Rev. Code § 1333.61(D)).

The Ohio Supreme Court uses a six-factor test for determining whether information constitutes a trade secret:  (1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, *i.e.*, by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.  *State ex rel. The Plain Dealer v. Ohio Dep't of Ins.*, 80 Ohio St. 3d 513,

524–25, 1997-Ohio-75, 687 N.E.2d 661 (1997). The person claiming a trade secret bears the burden of establishing that the information at issue qualifies for such protection under State law. *Id.* at 525 (citing *Amoco Prod. Co. v. Laird*, 622 N.E.2d 912, 920 (Ind. 1993)).

### I.B.2.b. Independent Economic Value

These Defendants argue that Plaintiff cannot prove the existence of a trade secret. (ECF No. 159-1, PageID #6469–74.) Specifically, they contend that Plaintiff cannot show that the information in its international patent application derives independent economic value from not being generally known. (*Id.*, PageID #6469–71.)

### i.

It is undisputed that the process described in Metron Nutraceuticals' international patent application (which Plaintiff argues Defendants misappropriated) creates a water suspension of clinoptilolite. (ECF No. 156-1, PageID #4891.) The testimony of Dr. Tsirikos-Karapanos shows that the process for creating a suspension appears to be well-known throughout the dietary supplement industry. For example, when asked about the prevalence of products containing such suspensions, he stated, "[t]here are *many* products in Europe and . . . the United States." (ECF No. 156-1, PageID #4959 (emphasis added).) Further, he identified at least five such products by name. (*Id.*)

Based on Plaintiff's own evidence and testimony, construed in its favor, those inside and outside the business know the underlying information, and others could expend little time and expense to create a competing product containing a suspension.

48

In fact, the latter point echoes the experience of Dr. Tsirikos-Karapanos.  He created the process described in the international patent application in his spare time over roughly five or six months while working at LifeHealth Science.  (*Id.*, PageID #5024–25.)  Nor does the record show that the process described in the international patent application is particularly distinctive.

Where, as here, information is generally known in the industry, it does not qualify as a trade secret.  *See Kondash v. Kia Motors Am., Inc.*, 767 F. App'x 635, 639 (6th Cir. 2019) (affirming a determination that documents did not contain trade secrets where the information was "already known throughout the [applicable] industry").  After careful consideration of the record presented, the Court determines that no reasonable jury could find that the information at issue derived independent economic value from its secrecy.

### ii.

The evidence to which Plaintiff points in response fails to create a genuine dispute of material fact on the issue.  First, it argues that its international patent application must have possessed and derived value from the brief period before its publication—after all, Defendants copied, relied on, and profited from its use.  (ECF No. 168, PageID #7156–57.)  To bolster this argument, Plaintiff cites testimony from Mr. Adams regarding the advantages of being first to market.  (*Id.*)  But it is difficult to imagine a case involving misappropriation where the defendant did not allegedly copy and profit from the information at issue.  Instead, the proper question under the law is whether the international patent application derived value from its secrecy while in Metron Nutraceuticals' possession.  *See State ex rel. The Plain Dealer*, 80

Ohio St. 3d at 524–25 (listing "the value to the holder in having the information as against competitors" as a factor when analyzing a trade secret claim).  The record here shows that it did not.  After realizing that the international patent application created only a suspension, Dr. Tsirikos-Karapanos abandoned the process.  (ECF No. 156-1, PageID #4891 & #4906; *see also id.*, PageID #4931.)  As a result, this factor weighs against the information constituting a trade secret.

Plaintiff's other counterargument fails for similar reasons.  Plaintiff maintains that the record presents "a clear factual question as to whether Vitality Detox Drops or CleanSlate would even exist but for [Defendants'] access to and use of the [the international patent application]."  (ECF No. 168, PageID #7157–58.)  That disputed fact is not material to disposition of the motion on summary judgment.  *See* Fed. R. Civ. P. 56(a).  Again, the law focuses on independent economic value from not being generally known.  On that issue, even if Vitality Detox Drops and CleanSlate owe their origins to the international patent application as Metron Nutraceuticals contends, this dispute of fact is not material.

To the extent Plaintiff generally challenges the propriety of any judicial determination at the summary-judgment stage as to whether the record can support classifying the information at issue as a trade secret (*see* ECF No. 168, PageID #7155 & #7156), precedent and the ordinary operation of the rules are against them.  The Sixth Circuit has affirmed determinations on summary judgment that disputed information does not constitute a trade secret.  *See, e.g.*, *R.C. Olmstead, Inc., v. CU Interface, LLC*, 606 F.3d 262, 276 (6th Cir. 2010); *Heartland Home Fin.*, 258 F. App'x

at 862–63; *ATC Distrib. Grp., Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 714–15 (6th Cir. 2005).  Indeed, "[t]he existence of a trade secret often will not be a question determinable on summary judgment . . . But not always." *Health Care Facilities Partners, LLC v. Diamond*, No. 5:21-cv-1070, 2023 WL 3847289, at *6 (N.D. Ohio June 5, 2023).  Plaintiff errs by suggesting or implying that summary judgment will never be appropriate on a trade-secret claim.  The Court does not take lightly a ruling taking a matter from the jury's consideration, but the record here supports the propriety of summary judgment.

Accordingly, Plaintiff cannot prove the existence of a trade secret, and its claim fails on the legal merits.  Because they jointly raised this issue (ECF No. 159-1, PageID #6468 & #6469), this analysis applies equally to all Defendants.  For all these reasons, the Court **GRANTS** Defendants' motion for summary judgment on Count I.

## II. Plaintiff's Prayer for Relief

In addition to its substantive claims, Plaintiff pursues separate counts for piercing the corporate veil and a preliminary injunction.  But neither are independent causes of action.  *Trinity Health Sys. v. MDX Corp.*, 180 Ohio App. 3d 815, 2009-Ohio-417, 907 N.E.2d 746, ¶ 26 (Ohio Ct. App.) (citing *Belvedere Condo. Unit Owners' Assn. v. R.E. Roark Cos., Inc.*, 67 Ohio St. 3d 274, 287, 1993-Ohio-119, 617 N.E.2d 1075 (1993)); *Wert v. Vanderbilt Univ.*, No. 3:20-cv-00140, 2020 WL 5039466, at *2 (M.D. Tenn. Aug. 26, 2020) (citations omitted).  Piercing the corporate veil permits individual shareholder liability for the actions of a corporation.  *Trinity Health Sys.*, 2009-Ohio-417, at ¶ 26.  And a request for a preliminary injunction is a procedural device to seek an interim remedy.  *Wert*, 2020 WL 5039466, at *2.  Accordingly, both

51

require success or the likelihood of success of the merits of an underlying claim. Here, because all of Plaintiff's substantive claims fail, it is not entitled to such relief.

Accordingly, the Court **GRANTS** Defendants' motion for summary judgment as to Counts VI and VII.

## CONCLUSION

This ruling disposes of all pending claims before the Court. Some are resolved through the parties' own requests for dismissal. Specifically, the Court **GRANTS** Ms. Cook and Metron Nutraceuticals' motions under Rules 41(a)(2) and 21, respectively. In doing so, the Court **DISMISSES WITH PREJUDICE** Ms. Cook's counterclaim, and, as to Plaintiff's claims, (1) Counts II, IV, and V in full, (2) Count III as to EnTox Solutions, and (3) Defendants Dr. Christina Rahm, LLC; Dr. Christina Ventures Incorporated; Cure the Causes, Inc.; Merci Dupre LLC; DC2 Holdings, LLC; DC2 Healthcare LLC; and Simply Wholeistic, Inc. in their entirety. Given Ms. Cook's dismissal, the Court **DENIES AS MOOT** Metron Nutraceuticals' cross-motion for summary judgment.

Regarding Plaintiff's remaining claims, the Court **GRANTS** Defendants' motion for summary judgment. For the reasons outlined above, the Court determines that: (1) the Ohio Uniform Trade Secrets Act preempts Plaintiff's breach of contract claim; (2) Plaintiff's claim for trade secret misappropriation against Ms. Cook and Mr. Thomas is time-barred and, as to all Defendants, fails on its legal merits; and (3) Plaintiff is not entitled to the relief demanded in Counts VI and VII.

**SO ORDERED.**

Dated:  July 18, 2023

J. Philip Calabrese
United States District Judge
Northern District of Ohio